**Chester Lee WICKER,**
**Petitioner-Appellant,**

**v.**

**O.L. McCOTTER, Director, Texas**
**Department of Corrections,**
**Respondent-Appellee.**

**No. 85–2459.**

United States Court of Appeals,
Fifth Circuit.

Feb. 18, 1986.

Charlotte Harris, Public Defender, Wichita Falls, Tex., Bruce V. Griffiths, Houston, Tex., for petitioner-appellant.

Jim Mattox, Atty. Gen., Paula C. Offenhauser, Asst. Atty. Gen., Austin, Tex., for respondent-appellee.

Before GEE, RUBIN and JONES, Circuit Judges.

ALVIN B. RUBIN, Circuit Judge:

Chester Lee Wicker was convicted of capital murder and, after a separate sentencing proceeding, was sentenced to death based on the jury's findings. He now seeks habeas corpus relief, asserting six bases in his petition. The district court found all of Wicker's claims lacking in merit. Because the district court did not err in its assessment, we affirm the judgment denying him relief.

## I.

Shortly after dark on April 4, 1980, Chester Lee Wicker was driving his mother's car on a street in Beaumont, Texas. He saw a young woman, Suzanne Knuth, walking along the street. He had never seen the woman before, but he turned the car around, pushed her into the car, and drove away. Two witnesses, Dee Ann Barthell and Jerry Adkins, told police officers that they had seen a woman struggling with a white man, who forced her into a grayish-silver Oldsmobile. Knuth's purse and necklace were found near the place the witnesses pointed out, and the area showed signs of a scuffle. From a photograph, Barthell tentatively identified Calvin Knuth, Suzanne Knuth's husband, as the abductor.

In the early morning hours of the next day, April 5, 1980, Wicker went to the home of Olive King, a family friend at Crystal Beach, Galveston, Texas. He said that his car was stuck in the sand at Crystal Beach near the Sun Oil Company field. At Wicker's request, King telephoned Wicker's uncle, Bob Wicker, for help. The car that Wicker had been driving, his mother's gray Oldsmobile Cutlass, was stuck in the sand on the beach, three or four miles from the Sun Oil field. Bob Wicker noticed blood on the floormat of the car and on his nephew's shirt, and asked Wicker about it. Wicker said that he had cut his arm. His uncle noticed, however, that the blood on his shirt was not in the place where Wicker

said he had been cut. Wicker later fled to California and thence to Washington. On April 11, 1980, he was seen by another uncle, Chester Vaughn, in El Centro, California.

Acting on information gained in investigating Ms. Knuth's disappearance, a deputy sheriff from the Jefferson County Sheriff's Office informed the Beaumont police that they should investigate the Crystal Beach area. Following the suggestion, Beaumont police spoke with Bob Wicker, who directed them to where Wicker's car had been stuck in the sand. They searched the area for two hours, but found nothing of significance.

The police then went to the apartment of Wicker's mother, Mary Wicker, where they noticed a car matching the description of the one seen during the abduction. While the police were inside the apartment interviewing Mrs. Wicker, the telephone rang and Detective Larry Thomas answered. The operator indicated it was a long distance call from "Chet" Wicker. He handed the phone to Mrs. Wicker, who took it to the far side of the room. Although she spoke in a low tone, the officers heard her say that the police were there. After she had completed the conversation, Mrs. Wicker told the police that the call was from her sister.

With the consent of Mrs. Wicker, the police searched her car and took hair and carpet samples. Two days later, Mrs. Wicker brought the car's floormats, which the police had seen inside the apartment, to the police station. At the time the police first saw the mats, they were dirty, but, when brought to the station, they were clean.

The investigation continued. After being hypnotized by a police hypnotist on April 14, Barthall, who was sixteen and who had witnessed the abduction en route to a disco, identified Wicker (rather than Calvin Knuth) from a photo spread. A few days later, Wicker's cousin, Adana Bennett, of El Centro, California, spoke by telephone with two Beaumont detectives, and with Wicker's grandparents and mother. She said that Wicker had telephoned her on April 18, said that he was in the state of Washington and that he wanted to return to Texas to "straighten out" his problems there. In these conversations, Wicker's family and the police made arrangements for Wicker to return to Galveston by bus. When Wicker later arrived in El Centro, California, he told Bennett that "he was in trouble, he was afraid he would have to go to prison," and his mother had been "pressuring" him to leave Beaumont. The next morning, April 21, a member of Wicker's family notified the Beaumont detectives that Wicker would arrive in Galveston and was coming back to tell what happened.

The Beaumont police and Wicker's grandfather, Paul Long, agreed that Long would meet Wicker in Galveston and take him to the Beaumont Police Station. Then the police learned from Long that Mary Wicker was planning to meet her son at the bus station in Houston. Apprehensive that Wicker might again flee, the police decided to obtain a warrant for his arrest on a charge of aggravated kidnapping.

Armed with the warrant, Beaumont and Houston police arrived at the Houston bus station between 10:30 and 11:00 p.m. on April 21. They met Mary Wicker and spoke with her. There is a dispute about what was said, but the police version is that Mrs. Wicker informed them that she had spoken with an attorney and asked that they let her talk with Wicker once he arrived. The police officers say they agreed that she might talk with him in their presence.

As Wicker got off the bus in Houston, just before midnight, April 21, he was arrested by two Houston police officers who turned him over to the Beaumont police. The Beaumont police gave Wicker *Miranda* warnings within minutes of the arrest. They testified that they then looked around for Mrs. Wicker, but did not see her. Mrs. Wicker, however, said that the police refused to let her meet with her son.

Four policemen traveled from Houston to Beaumont with Wicker by car. One officer testified that, during the ride, he told Wick-

er what he knew about the offense and that he wanted Wicker to show him where the body was. He urged Wicker to give him this information so the victim's family could give her "a decent burial," a "Christian burial." Wicker responded that he "wanted to [help] but that it was bad" and asked for assurance that he would not be hurt. The officer testified that after he reassured Wicker, Wicker agreed to show the police where he had buried the body. They proceeded to that part of Crystal Beach where the Oldsmobile had been stuck in the sand, and conducted a quick search in the dark, but were unable to locate anything. Wicker gave some details of the offense and agreed to give a statement in Beaumont. The testimony was confirmed by the testimony of the other three officers. Wicker gave a different account, asserting that he had been threatened and physically abused by the police and he thereafter acted in fear of physical harm.

When the group arrived in Beaumont, the police took Wicker to the Jefferson County District Attorney's Office, where they read *Miranda* warnings to him. Wicker gave a written statement (the Beaumont statement) in which he affirmatively waived his rights to counsel and to remain silent. The taking of the statement was completed about 4:30 a.m., at which time Wicker was booked. At about 6:00 a.m., the Beaumont authorities took Wicker back to the beach. Wicker showed them where the body was buried and also led them to where he had buried some of the victim's belongings. Part of the body, which was only partially buried in an area surrounded by weeds, was sticking out of the sand. The place where the body was found was in Galveston County, the county seat of which is in Galveston, not in Jefferson County, in which Beaumont is located.

Upon returning to Beaumont, the police photographed Wicker and then, at 8:35 a.m., brought him before a magistrate who gave him the warnings required by Texas statute. Wicker asked to telephone his mother and was permitted to do so. He was then confined in the Beaumont County jail. Wicker informed the police that his mother had communicated with an attorney. Two lawyers arrived shortly thereafter and asked to speak with Wicker. The police allowed the conference. The lawyers advised Wicker not to say anything or sign any statement and then left.

Wicker had said in his Beaumont statement that Suzanne Knuth had jumped from the moving car, and that the fall either knocked her unconscious or killed her. On April 23, however, the police laboratory reported to Detective Thomas that the clothing of the deceased showed no signs of having fallen out of a moving car. Thomas told Wicker of the lab results and Wicker then made an oral statement to Thomas, which was not reduced to writing.

Wicker was indicted by the Galveston County grand jury for capital murder on April 24. On the same day, about 5:00 p.m., he was informed of the charges by a criminal investigator from the Galveston County District Attorney's Office, who again gave him *Miranda* warnings.

Thereafter, the police transported Wicker to Galveston. During the trip, Wicker told the police that he understood his rights. He said he had spoken with an attorney in Beaumont, but had not retained that attorney because his fees were to high. One of the lawyers, Laine, testified that he had been retained by Mary Wicker, Wicker's mother, and had represented Wicker in a bond reduction hearing, but that his representation ceased when Wicker was transferred to Galveston. During the trip, Wicker agreed to give another statement, but said he first wanted to see a psychiatrist.

After Wicker arrived in Galveston, a Galveston County Justice of the Peace met with him at the Galveston city jail and gave him the warnings required by Texas statute, post-*Miranda*, specifically informing Wicker of his right to appointed counsel. Wicker, however, made no request for appointed counsel, responding only that he understood what the magistrate was saying. Defense counsel was not appointed to

represent Wicker until sixteen days after his arrest and thirteen days after his indictment.

Later that day, an assistant district attorney made a motion to the court to appoint a psychiatrist to examine Wicker. The court appointed Dr. Ed Gripon and he met with Wicker at the district attorney's office on April 26 for about two hours. Before this interview, Wicker was given *Miranda* warnings and expressly waived his rights.

After the meeting, Wicker agreed to give the police a statement. At 7:26 p.m., the police again gave Wicker *Miranda* warnings, this being at least the fifth time Wicker was informed of his rights. The authorities then went over Wicker's Beaumont statement, and asked him to indicate which portions were correct. After several hours, a new statement (the Galveston statement) was typed. Wicker was again given *Miranda* warnings, and, after verbally waiving his rights, he reviewed his statement, made corrections, and signed it. Before signing the statement, he asked that he be permitted to call his grandfather. The police did not allow the phone call and told Wicker that the statement was "his alone to make or not to make." Thereafter, Wicker signed the statement, which contained an express waiver of his rights. Only the Galveston written confession was introduced against Wicker at trial. Parts of the confession were omitted by the state, but were introduced by the defense.

## II.

Wicker asserts that he was denied his constitutional right to confront the witnesses against him and his due process right to a fair trial by the admission of the hypnotically-enhanced testimony of Dee Ann Barthell. The state responds that this claim was not asserted at trial or on direct appeal and is, therefore, barred by the procedural-default doctrine.

As we have noted, Ms. Barthell's hypnotically-induced identification of Wicker was admitted into evidence. While her in-court testimony was somewhat tentative, she testified that she had, after hypnosis, picked out Wicker's picture from a photo spread. Trial counsel objected on the ground that the testimony was unreliable and suggestive,[1] but the confrontation and due process issues were not specifically raised by counsel. Wicker asserts that this objection put the court and the district attorney on notice of the potential problems raised by the posthypnotic testimony and that counsel had cause for failure to raise the confrontation issue.

The fact that a witness has been hypnotized before testifying does not *per se* require disqualification, as we held in *United States v. Valdez.*[2] The admissibility of such testimony is to be evaluated on a case-by-case basis. The probative value of the testimony is to be weighed against its possible prejudicial effect. In this case, we do not discern any prejudice to Wicker resulting from the admission of Ms. Barthell's testimony. On direct examination, her testimony corresponded substantially to what she wrote in a statement given before the hypnotic session. On direct, Ms. Barthell did not identify Wicker as being the abductor. It was only after Wicker's counsel, on cross-examination, elicited the fact that Ms. Barthell had "identified" the victim's husband as "looking like" the abductor that the state, on redirect, elicited testimony from her that she had selected Wicker's picture from a photo spread after being hypnotized. Even her identification at trial was fully probed on cross-examination. Ms. Barthell's testimony as to the abduction was cumulative of that of Jerry Adkins, who testified without objection. There was also substantial independent evidence that the deceased had been abducted: her purse was found at the abduction site,

**1.** *See, e.g., United States v. Adams,* 581 F.2d 193, 198–99 (9th Cir.), *cert. denied,* 439 U.S. 1006, 99 S.Ct. 621, 58 L.Ed.2d 683 (1978); *Greenfield v. Robinson,* 413 F.Supp. 1113, 1120–21 (W.D.Va. 1976).

**2.** 722 F.2d 1196, 1201, 1203 (5th Cir.1984); *see also United States v. Harrelson,* 754 F.2d 1153, 1180–81 (5th Cir.), *cert. denied,* — U.S. ——, 106 S.Ct. 599, 88 L.Ed.2d 578 (1985).

which showed evidence that a struggle had occurred. In addition, Wicker had confessed to kidnapping the deceased.

Under some circumstances, hypnosis may render a witness so positive, so certain, that effective cross-examination is impossible.[3] The record in this case, however, demonstrates that hypnosis did not have that effect on Ms. Barthell. In this case, Wicker was not denied his right to confront the witness, Barthell, nor was he denied a fair trial.[4] Therefore, we need not determine whether there was adequate cause to raise these additional constitutional objections to the hypnotically-induced testimony or whether the defense is now barred by procedural default when other objections, but not these, were raised.[5]

### III.

Wicker contends that his right to an impartial jury was violated by the trial court's exclusion of a prospective juror, W.N. Jones. Jones, a retired Army Reserve officer, expressed doubts that he could assess the death penalty and that, knowing a death sentence might result, he could answer affirmatively the questions that would be asked at the punishment phase of the trial.

To determine when a prospective juror may be excluded for cause because of his or her views on capital punishment, the inquiry is "whether the juror's views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.'"[6] This is the standard applied by the Supreme Court in *Wainwright v. Witt*,[7] which clarifies the Court's earlier decision in *Witherspoon v. Illinois*,[8] and reaffirms the standard enunciated in *Adams v. Texas*.[9] It is a test to be applied primarily by the trial court, for determinations of juror bias depend in great degree on the trial judge's assessment of the potential juror's demeanor and credibility, and on his impressions about that venireman's state of mind.[10] The trial court's determination that a prospective juror could not perform his statutory function faithfully and impartially is accorded a presumption of correctness under 28 U.S.C. § 2254(d).[11] A trial court is not required to spell out his specific reasons for excusing each venireman.[12] Even if the record is silent as to the standard employed by a state trial judge, as it is here, he is presumed to have applied the correct standard.[13] There is support in the record of Wicker's trial for the trial court's determination that Jones's views might substantially impair his performance as a juror, and we cannot substitute our judgment for his.

The argument that exclusion of jurors under *Witherspoon* subjects an accused to a jury panel unfairly biased on the issue of guilt and deprives the accused of a fairly cross-representative jury has been

---

**3.** *See Valdez,* 722 F.2d at 1202; *Clay v. Vose,* 771 F.2d 1, 3–4 (1st Cir.1985).

**4.** *Compare Clay v. Vose,* 771 F.2d at 4–5; *United States v. Charles,* 561 F.Supp. 694 (S.D.Tex. 1983).

**5.** *See Wainwright v. Sykes,* 433 U.S. 72, 90–91, 97 S.Ct. 2497, 2508–09, 53 L.Ed.2d 594, 610–11 (1977); *Engle v. Isaac,* 456 U.S. 107, 129–34, 102 S.Ct. 1558, 1572–75, 71 L.Ed.2d 783, 800–04 (1982).

**6.** *Wainwright v. Witt,* — U.S. ——, ——, 105 S.Ct. 844, 852, 83 L.Ed.2d 841, 852 (1985) (quoting *Adams,* 448 U.S. at 45, 100 S.Ct. at 2525, 65 L.Ed.2d at 588).

**7.** *Id.,* — U.S. at ——, 105 S.Ct. at 852, 83 L.Ed.2d at 852.

**8.** 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

**9.** 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980).

**10.** *Wainwright v. Witt,* — U.S. at ——, 105 S.Ct. at 854, 83 L.Ed.2d at 854.

**11.** *Id.* at ——, 105 S.Ct. at 853–54, 83 L.Ed.2d at 853–54.

**12.** *Id.* at ——, 105 S.Ct. at 855–56, 83 L.Ed.2d at 855–56.

**13.** *Id.* at ——, 105 S.Ct. at 856, 83 L.Ed.2d at 856 (citing *Marshall v. Lonberger,* 459 U.S. 422, 433, 103 S.Ct. 843, 850, 74 L.Ed.2d 646, 658 (1983)).

consistently rejected by us.[14] We are of course aware of the contrary result reached by the Eighth Circuit in *Grigsby v. Mabry*,[15] but, until the Supreme Court affirms that decision, we are bound by the law of this circuit.

## IV.

Wicker urges that his defense counsel made mistakes throughout both the trial and the direct appeal and that these errors, taken as a whole, resulted in ineffective assistance of counsel. He also contends that, at the punishment stage, his counsel called two psychiatrists whose testimony on direct examination virtually required the jury to answer one of the special issues on punishment affirmatively, which resulted in his death sentence.

### A.

*Strickland v. Washington*[16] holds that counsel is not so ineffectual as to entitle the defendant to a new trial unless the habeas applicant shows that (1) the counsel made errors so egregious that he was not functioning as the "counsel" guaranteed by the sixth amendment[17] and (2) the deficient performance so prejudiced the defense that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."[18] In a death sentence challenge, specifically, the "question is whether there is a reasonable probability that, absent the [counsel's] errors, the sentencer—including the appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."[19] Applying this

standard, we review each of the failures of counsel that allegedly occurred during both the guilt and sentencing phases of the trial.

■ Wicker faults his trial lawyer for accepting Dr. R. Simmons as a juror. In response to the defense counsel's question whether he would consider in his deliberation the failure of the defendant to testify, Dr. Simmons stated, "I could consciously try not to. I'm not certain that I could." When later asked whether he would follow the court's charge not to take the petitioner's failure to testify into consideration, Dr. Simmons stated, "I have never had to do it so I can't tell you with certainty. All I can tell you I could try my best to do it." He thereafter stated that he could set aside his own feelings and apply the law as given in the charge. Reading Dr. Simmons' testimony most favorably to Wicker, it is uncertain whether Dr. Simmons would consider Wicker's failure to testify as evidence of guilt.

At the habeas corpus evidentiary hearing, however, one of Wicker's trial lawyers testified that he nonetheless wanted Dr. Simmons on the jury because Simmons was a young mechanical engineer. Counsel wanted someone on the jury who had an "analytical constitution," a person who would carefully review the medical evidence presented, and who might accept the defense's main theory that the state failed to prove beyond a reasonable doubt that the cause of death was by "choking" or "burying alive," as was alleged in the indictment. In accepting Dr. Simmons as a juror, defense counsel reached a strategic decision, a decision of the kind that able

14. *See, e.g., Rault v. Louisiana*, 772 F.2d 117, 133 (5th Cir.1985); *Watson v. Blackburn*, 756 F.2d 1055, 1057 (5th Cir.1985).

15. 758 F.2d 226 (8th Cir.), *cert. granted sub nom., Lockhart v. McCree*, — U.S. —, 106 S.Ct. 59, 88 L.Ed.2d 48 (1985).

16. 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

17. *See id.* at 689–90, 104 S.Ct. at 2065–66, 80 L.Ed.2d at 693–94.

18. *Id.* at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 698; *see also Mattheson v. King*, 751 F.2d 1432, 1437–38 (5th Cir.1985); *Celestine v. Blackburn*, 750 F.2d 353, 356 (5th Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 3490, 87 L.Ed.2d 624 (1985); *Milton v. Procunier*, 744 F.2d 1091, 1099–1100 (5th Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 2050, 85 L.Ed.2d 323 (1985).

19. *Strickland*, 466 U.S. at 695, 104 S.Ct. at 2069, 80 L.Ed.2d at 698–99.

defense counsel frequently make. This is effectiveness, not ineptness.[20]

 Wicker also contends that defense counsel were ineffective for failing to make a motion for mistrial and for failing to ask members of the venire about community attitudes "when the atmosphere in Galveston County on the subject of rape became one of extreme fear and rage two days after jury selection began." Both of the defense counsel testified at the evidentiary hearing that they did not desire a change of venue for strategic reasons. In their professional judgment, they considered Galveston County to be a more cosmopolitan area and to have a "better record" than most places in Texas for trial of capital cases.

Indeed, during voir dire, when news articles on rapes in Galveston appeared, one of the defense lawyers prepared a motion for mistrial. After consulting with the court, however, he elected to withhold his motion pending completion of the voir dire, in order to determine the impact of the various news articles on the jury. Counsel's feeling during voir dire was that the jury was not "overwhelmed" by the event. He also observed that at least the first ten jurors resided outside Galveston. Nonetheless, on January 29, 1981, defense counsel presented their motion for mistrial based on community coverage of rapes and a hearing was held. The trial court reviewed all the evidence and denied the motion for mistrial.

Implicit in the trial court's denial is a factual determination that the pretrial publicity about rapes in Galveston did not create the kind of "wave of public passion" that would have made a fair trial unlikely. This implicit factual determination is entitled to a presumption of correctness under 28 U.S.C. § 2254(d).[21] Our independent review of the record confirms that counsel's failure to raise the issue earlier or to seek

to examine the members of the venire about community attitudes was not an omission constituting ineffective assistance of counsel, nor does the record show how it prejudiced Wicker. The district court correctly found that Wicker failed to demonstrate either any deficiency on the part of counsel or actual prejudice.

 Wicker also challenges counsels' effectiveness because of the alleged failure to make complete objections to certain closing arguments by the state at the guilt phase. After the prosecutor stated that the deceased was raped, Wicker's counsel objected to the argument and the objection was sustained, but Wicker faults counsels' failure to seek an instruction to disregard the argument. One of the defense lawyers testified at the evidentiary hearing that the primary purpose of his objection was to alert the jury that there was not "very good evidence" of rape and to have a chance to speak to the jury while the state was arguing. While it might have been better for him to have pursued the matter further and seek an instruction to disregard the argument, we fail to perceive resultant prejudice under the *Strickland* standard.

 Wicker also complains that the state in closing argument argued a theory not covered by the charge against him. The prosecutor stated that, if Wicker "intentionally choked the girl, ... intentionally stuck her head in sandy water or ... intentionally buried her, ... this is sufficient to prove capital murder." Defense counsel objected to the argument on the ground that it was contrary to the court's charge, and the trial court instructed the jury that they were to be governed by the charge. Wicker again faults counsel for failing to request an instruction to the jury to disregard the statement.

---

20. *See, e.g., Milton v. Procunier,* 744 F.2d 1091, 1098–1100 (5th Cir.1985).

21. *Cf. Patton v. Yount,* 467 U.S. 1025, —— & n. 7, 104 S.Ct. 2885, 2889 & n. 7, 81 L.Ed.2d 847, 854 & n. 7 (1984); *Rushen v. Spain,* 464 U.S.

114, 119–21, 104 S.Ct. 453, 456–67, 78 L.Ed.2d 267, 273–75 (1984); *Murphy v. Florida,* 421 U.S. 794, 802–03, 95 S.Ct. 2031, 2037–38, 44 L.Ed.2d 589, 595–96 (1975).

The trial court, however, instructed the jury to follow the court's charge and the charge included proper jury instructions on the cause of death. Applying the *Strickland* standard, we, therefore, perceive no prejudice to Wicker, nor do we see how either argument would have constituted reversible error had the points been properly preserved and raised on appeal.[22]

**B.**

■■■ Wicker's challenge to counsels' effectiveness at the punishment phase centers on his attorneys' decision to present the psychiatric testimony of two doctors. Wicker asserts, first, that counsel failed to conduct a reasonable investigation of the potential testimony before putting the witnesses on the stand; and, second, that both doctors' testimony was fatally unfavorable to Wicker. The doctors testified that Wicker has an antisocial personality and that antisocial personalities "repeat the pattern." Such persons, according to the experts' testimony, cannot learn from past experience. Their violent behavior tends to increase rather than abate.

At the federal habeas corpus evidentiary hearing, defense counsel testified that they were aware that parts of the doctors' testimony might be harmful to the defense on the issue of future dangerousness. Nonetheless, they called the doctors in order to attempt to establish that Wicker had previously sought psychiatric help and to show that he was suffering from a recognized psychiatric disease, which was heightened by drug and alcohol abuse, for Wicker had stated in his confession that, immediately before committing the crime, he had drunk gin and taken drugs. Counsel wanted to show that Wicker's situation was not hopeless—his violent sexual tendencies toward women would "burn out" as he aged, and the factors stimulating these impulses (women, alcohol, and drugs) would not be available to him in prison. They hoped to

establish that, if the precipitating factors were removed, Wicker's propensities to commit antisocial acts against women would decrease and he would not be a future danger to society. Defense counsel viewed the evidence presented by the state in the punishment phase as devastating, for the state had shown that Wicker had been convicted twice previously of felonies involving assault and rape and once of a misdemeanor after the charge of a similar assault had been reduced. In addition, two females, one a particularly young and attractive college student, had testified in the sentencing hearing that Wicker had assaulted them.

Defense counsel testified that they believed that the jury would assess the death penalty "if something wasn't done," and that they therefore took what they called a "calculated risk" in presenting the psychiatric testimony. In their professional judgment, this presented the jury with a reasonable alternative to the imposition of death. One of defense counsel testified that, even with the benefit of hindsight, he would make the same decision again. The district court, therefore, was amply supported by the record in finding that the decision to call these witnesses constituted trial strategy formulated after a reasonable inquiry into the relevant facts and alternatives.[23]

Two lawyers were appointed by the state court to represent Wicker. One of them had practiced almost a decade and had worked as a prosecutor for more than five years. After the less-experienced lawyer had withdrawn before trial on medical advice, due to the stress of his assignment, another was appointed. He was an experienced trial lawyer certified as a criminal law specialist. Each diligently fulfilled his assignment. The state record in this case, including the testimony on motions to suppress, contains twenty-four volumes. We have read all of it. Counsel conducted an able defense and fought the prosecution

**22.** *Cf. Knighton v. Maggio,* 740 F.2d 1344, 1351 (5th Cir.), *cert. denied,* — U.S. —, 105 S.Ct. 306, 83 L.Ed.2d 241 (1984); *Griffin v. Wainwright,* 760 F.2d 1505, 1513 (11th Cir.1985).

**23.** *See Strickland v. Washington,* 466 U.S. 668, 691, 104 S.Ct. 2052, 2066, 80 L.Ed.2d 674 (1984).

every step of the trial. This does not mean, of course, that they could not have made an error, but, having reviewed each of the asserted errors of trial, we agree with the district court that the lawyers cannot be stigmatized as "ineffective."

Finally, petitioner attacks counsels' performance on appeal, relying on *Evitts v. Lucey.*[24] As we held in *Schwander v. Blackburn,*[25] the *Strickland* standard applies to claims of ineffective assistance of counsel on appeal and requires proof showing both a failure of counsel to perform according to reasonable professional standards and prejudice.

■ Unlike Lucey's counsel, Wicker's defense counsel perfected the appeal, raised and extensively briefed a number of issues. They testified that they prepared the appellate brief jointly, working fulltime on it for a period of eight to ten days. The fact that counsel did not argue every possible point on appeal, but, as they testified at the federal habeas corpus hearing, researched all issues and raised only those that they thought had some plausible merit, represented the kind of strategy that able counsel pursue and appellate courts appreciate.[26] We find neither ineffectiveness nor resulting prejudice in counsels' failure to raise on direct appeal the admission of the hypnotically-enhanced testimony of Ms. Barthell; the exclusion of Veronica Leong, a member of the venire; the failure to contest the alleged cause of death; or the district court's failure to charge the jury on the lesser-included offenses of involuntary manslaughter and kidnapping.

## V.

■ Wicker contends that the discovery of the victim's body and the other physical

evidence found at Crystal Beach violated the fourth amendment because it resulted from an illegal arrest and statements given after that arrest. The state trial court found that the police did not have probable cause to arrest Wicker in Houston. But the court also found that, despite Wicker's being subjected to a police officer's version of the "Christian burial" speech[27] during the return trip from Houston to Beaumont, all of Wicker's oral and written statements, whether or not admissible, were voluntary and were untainted by the arrest. The trial court also found that the body and items located on the beach would inevitably have been discovered by law enforcement officers or private citizens, had Wicker not taken police to the scene. These findings were upheld on appeal to the Texas Court of Criminal Appeals.

The state contends that *Stone v. Powell*[28] bars review of petitioner's fourth amendment claim because the claim was fully and fairly litigated in the state trial court and on direct appeal. This is supported by Fifth Circuit precedent, for in *Billiot v. Maggio,*[29] we stated: "Federal courts possess no authority in habeas proceedings to scrutinize a state court's application of fourth amendment principles absent a showing that the petitioner was denied a full and fair opportunity to litigate a claim arising out of a putatively illegal search or seizure."[30] Our independent review of the state court record in this case does not suggest that Wicker's opportunity to contest the admissibility of the physical evidence relating to the body's discovery was in any way circumscribed. The Texas state courts found that both the Beaumont and Galveston statements were untainted by the illegal arrest and that, in any event,

24. — U.S. —, 105 S.Ct. 830, 83 L.Ed.2d 821 (1985).

25. 750 F.2d 494, 501–02 (5th Cir.1985).

26. *See Evitts v. Lucey,* — U.S. —, 105 S.Ct. 830, 834–35, 83 L.Ed.2d 821 (1985); *Barnes v. Jones,* 463 U.S. 745, 752–53, 103 S.Ct. 3308, 3312–13, 77 L.Ed.2d 987, 993–94 (1983).

27. *Compare Brewer v. Williams,* 430 U.S. 387, 392–93, 97 S.Ct. 1232, 1236–37, 51 L.Ed.2d 424, 432–33 (1977).

28. 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

29. 694 F.2d 98 (5th Cir.1982).

30. *Id.* at 100 (citing *Stone v. Powell,* 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976)).

all evidence relating to the body was admissible under the "inevitable discovery" doctrine, discussed by the United States Supreme Court in *Nix v. Williams.*[31]

The record shows that, once the police knew of Wicker's impending return, they decided to wait to see whether he would disclose where the body was. If he did not (or could not) they planned a further search of the beach area using a technique known as grid or circular search, and using a grader to scrape the top layer of sand lightly to attempt to uncover the body. Although the circumstances of this case and those in *Nix v. Williams* are distinguishable,[32] we cannot say that the state courts' determination that the state proved by a preponderance of the evidence[33] that the body would have inevitably been discovered is without fair support in the record.

## VI.

■ Wicker challenges both the Beaumont and Galveston statements as involuntary despite the state trial judge's findings that both were voluntary. While the Beaumont confession was not introduced into evidence, the argument runs that the Galveston confession was involuntary because it tracked the Beaumont statement and was given in exchange for promises of psychiatric help. In oral argument, Wicker also contended that the totality of the circumstances leading up to the Galveston statement proves it to be involuntary, relying on the Supreme Court's holding in *Miller v. Fenton*[34] that the issue of voluntariness of a defendant's confession "is a legal question requiring independent federal determination."[35] The Court there explained, "[t]o be sure, subsidiary factual questions, such as ... whether in fact the police engaged in the intimidation tactics alleged by the defendant ... are entitled to the § 2254(d) presumption."[36] However, "the ultimate question whether, under the totality of the circumstances, the challenged confession was obtained in a manner compatible with the requirements of the Constitution is a matter for independent factual determination."[37]

In accordance with the *Miller* rule, the federal district court correctly accorded a presumption of correctness to the state trial court's factual finding that the Galveston confession was not induced by a promise of psychiatric help. This finding is not clearly erroneous. Neither do we find the federal district court's ultimate conclusion that the Galveston statement was freely and voluntarily given in error. *Miller* requires us to review independently all the circumstances surrounding the giving of the statement, and we have done so. In this case, by the time the Galveston confession was made, Wicker had spoken to his mother and to his grandfather, had received the advice of counsel, and had been given *Miranda* warnings at least five times. It is undisputed that Wicker returned to Texas to "straighten out" the situation. His allegations that the police used strong-arm tactics to secure the Galveston statement are contradicted by the testimony of four witnesses, whom the state trial court credited. We find, after a plenary review of the record, that Wicker's Galveston statement was knowingly and voluntarily made.

For the reasons stated above, we AFFIRM the district court's judgment denying Wicker's petition for federal habeas relief.

**31.** 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); *cf. United States v. Cherry,* 759 F.2d 1196, 1205–06 (5th Cir.1985).

**32.** *See id.,* 104 S.Ct. at 2511–12.

**33.** *See id.* at 2509.

**34.** —— U.S. ——, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985); *see also Moran v. Blackburn,* 781 F.2d 444 at 445 (5th Cir.1986).

**35.** *Id.* —— U.S. at ——, 106 S.Ct. at 450, 88 L.Ed.2d at 411.

**36.** *Id.* at ——, 106 S.Ct. at 451, 88 L.Ed.2d at 412–13.

**37.** *Id.* at ——, 106 S.Ct. at 451, 88 L.Ed.2d at 412–13.