UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

_____

No. 93-8499
_____

WALTER KEY WILLIAMS,

Petitioner-Appellant,

versus

JAMES A. COLLINS, Director,
Texas Department of Criminal Justice,
Institutional Division,

Respondent-Appellee.

_____

Appeal from the United States District Court
for the Western District of Texas
_____
(March 7, 1994)

Before DAVIS, JONES, and DUHÉ, Circuit Judges.

EDITH H. JONES, Circuit Judge:

Appellant Walter Williams was convicted of capital murder in Bexar County, Texas and sentenced to death. The Texas Court of Criminal Appeals affirmed his conviction. See Williams v. State, 668 S.W.2d 692 (Tex. Crim. App. 1983), cert. denied, 466 U.S. 954 (1984). In 1986, Williams filed an application for federal habeas relief. Williams's case was initially referred by the district court to Magistrate Judge Jamie Boyd. Because of Boyd's impending retirement from the bench, the case was subsequently referred to Magistrate Judge Robert O'Connor. Magistrate Judge O'Connor recommended denying relief; his

recommendations were adopted by order of then-District Judge Emilio Garza. Williams filed a motion to alter or amend judgment based upon then-recent decisions by the Supreme Court and the Fifth Circuit which mandated a re-examination of the district court's decision. Upon reconsideration, both the magistrate judge and District Judge Edward Prado adhered to the earlier decision, and a certificate of probable cause was issued. Williams now appeals.

## I. BACKGROUND

On the evening of February 9, 1981, Appellant Walter Williams and a friend, Theodore Edwards, went to the home of Williams's parents, where Williams was living at the time. While there, the two men took a .38 revolver belonging to Williams's mother and walked to a nearby gas station. Williams stayed in the parking lot as Edwards proceeded to the store service window, shot twice at the gas station attendant and killed him, reached through the window, and took the money. After Edwards and Williams left the scene, they split the money. At approximately 9:00 p.m. that same evening, the police responded to a call reporting a robbery in progress. Upon their arrival at the gas station, the police discovered the body of the clerk.

Later that same night, Williams and Edwards went for a car ride. While driving around, the two men discussed the fact that they were both short of cash, so they decided to rob a nearby Circle K convenience store at which Williams had previously worked. When they arrived at the Circle K, Williams

2

placed the revolver in the waistband of his trousers and entered the store with Edwards. Williams knew Danny Liepold, the clerk who was working that evening, because Williams had worked with Liepold in that same store before. Williams and Edwards picked up food items and took positions at opposite sides of the counter. When Liepold turned his back to Williams in order to wait on Edwards, Williams fatally shot Liepold in the back. After Liepold fell to the floor, Edwards and Williams went behind the counter to open the two cash registers located in the store. Unable to open the register that he was working on, Williams ran to the car, leaving Edwards inside the store. He yelled at Edwards from the car that they should leave. At that point, Williams saw someone drive by. Becoming scared, he left the scene without Edwards. Williams went home and went to bed. He had been asleep for a half hour before he was awakened by the police.

At approximately 2:00 a.m. on February 10, 1981, Roberto Gutierrez, a friend of Danny Liepold and fellow employee of the Circle K who worked at a different location, drove to the store to talk to Danny. After Gutierrez had visited with Danny at the Circle K, he left to run a quick errand, planning to return shortly. Upon returning approximately 20 minutes later, Gutierrez noticed a car suspiciously parked parallel to the front of the store and two men standing inside the store trying to open the cash registers. Gutierrez recognized one of the men as Walter, an employee of the store. Concerned for Danny, whom he

3

did not see, Gutierrez slowly drove by the store once and turned around to look into the store a second time. Upon driving by the second time, he noticed that one of the men was in the car pulling away, leaving behind the other man who was walking toward the car. Gutierrez followed the car for about 20 minutes and managed to get a description and take down its license plate number.

As Police Officer Thomas Estrada drove toward the Circle K at approximately 2:30 a.m. to make a routine check, he noticed a man walking away from the store. Unable to see the clerk inside the store, Officer Estrada parked his car and entered the store. He discovered Liepold lying beneath the counter in a pool of blood. Estrada immediately notified the dispatcher and described the man he had seen walking away just moments before. Gutierrez then returned to the store with a description of the car and its license plate number. Gutierrez told the police that he saw two men and recognized one of the men as an attendant named Walter who worked at that store on weekends.

Shortly thereafter, Police Officer Heim arrested Ted Edwards about a mile away. Following his arrest, Officer Estrada and Gutierrez positively identified Edwards as the man they had seen earlier at the store. After being advised of his rights, Edwards denied having had anything to do with the robbery and shooting. However, when it was discovered that he had a package of cigarettes which, based on the stamp on the bottom of the

4

package, came from that Circle K, Edwards admitted his involvement in the shooting and robbery.

Officer Roy Thomas arrived at the scene at approximately 3:30 a.m. and read Edwards his rights again. Edwards identified Williams as the other person involved in the shooting and told Officer Thomas where Williams lived. Relying on Edwards's directions, several officers drove to Williams's house, where they discovered a car matching the description and license plate number provided by Gutierrez. Lucian Williams, Williams's father, answered the door and, after having the situation explained to him, let the officers in to look for his son.

As the officers entered Williams's bedroom, they saw Williams asleep on the bed with a revolver in plain view on the nightstand. The jury was not informed that the officers also saw on the nightstand a birthday card given to Williams by Danny Liepold, the man Williams had just killed. Officer Thomas woke Williams and read him his rights. Williams was not under the influence of drugs or alcohol at the time of his arrest. A .38 caliber copper-jacketed bullet recovered from Liepold's body was positively identified as having been fired from the revolver recovered from atop Williams's nightstand. An additional .38 caliber bullet was recovered from the car, parked in front of the house, that matched the vehicle and license plate number that Gutierrez had described.

5

Upon arrival at the police station, Williams was again advised of his rights, and he made a written, signed voluntary statement regarding the robbery. The following morning, Williams asked that he be allowed to amend the written statement. Detective Abel Juarez read him his rights for the third time, and Williams gave a new statement, again indicating his involvement in the robbery, but admitting, contrary to his first statement, that it was he, not Edwards, who had shot the clerk in the Circle K. Additionally, after being advised of his rights still one more time, Williams told Officer Michael Akeroyd of his involvement in the shooting at the gas station the night before. Williams was convicted of capital murder for the robbery and shooting at the Circle K.

## II. DISCUSSION

### A. Standard of Review

In reviewing requests for federal habeas corpus relief, this court reviews the district court's findings of fact for clear error, but reviews issues of law de novo. See Barnard v. Collins, 958 F.2d 634, 636 (5th Cir. 1992), cert. denied, ___ U.S. ___, 113 S.Ct. 990 (1993). A finding of fact made by the district court is clearly erroneous only when the reviewing court, after reviewing the entire evidence, is left with the definite and firm conviction that a mistake has been committed. See Self v. Collins, 973 F.2d 1198, 1203 n.12 (5th Cir. 1992) (citing Anderson v. City of Bessemer, 470 U.S. 564, 573, 105

S.Ct. 1504, 1511 (1985)), <u>cert. denied</u>, ___ U.S. ___, 113 S.Ct. 1613 (1993).

Williams complains that the federal district court incorrectly presumed the state court factual findings to be correct. Williams improperly relies on a footnote that appeared in the original opinion of <u>Spriggs v. Collins</u>, 993 F.2d 85 (5th Cir. 1993), and was deleted prior to publication. However, as it was not part of the final published opinion, that footnote is of no significance. Moreover, this court has held, in accordance with the language of 28 U.S.C. § 2254(d) and Supreme Court rulings, that a federal court is to accord a presumption of correctness to findings of state court proceedings unless particular statutory exceptions to § 2254(d) are implicated. <u>See</u> <u>Sumner v. Mata</u>, 449 U.S. 539, 547, 101 S.Ct. 764, 769 (1981); <u>Loyd v. Smith</u>, 899 F.2d 1416, 1425 (5th Cir. 1990). Williams has not contended that any of the § 2254(d) exceptions are applicable to his case, nor have we noticed any defects in the state procedures. Consequently, the presumption of correctness was properly invoked here.

**B.  Ineffective Assistance of Counsel Claim**

<u>1.  Trial</u>

Williams complains that he received ineffective assistance of counsel in violation of the sixth amendment because trial counsel failed (1) to prepare and investigate adequately in preparation of his case in mitigation at the sentencing phase of his trial, (2) to object during <u>voir dire</u> examination of

7

potential jurors when three venire members were stricken for cause from the panel, (3) to request a psychiatric examination, and (4) to object to the testimony of the victim's mother regarding the victim's good character.

Under Strickland v. Washington, in order to establish a sixth amendment ineffectiveness claim, Williams must demonstrate that his counsel's performance (1) was seriously deficient and (2) probably affected the outcome of the trial. See Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); King v. Puckett, 1 F.3d 280, 284-85 (5th Cir. 1993). Failure to establish both deficient performance and prejudice defeats an ineffectiveness claim. See Strickland, 466 U.S. at 700, 104 S.Ct. at 2071; King, 1 F.3d at 285.

This court must bear in mind that we review narrowly professionally deficient conduct:

> Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. . . . There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way.
>
> . . .
>
> Thus, a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct. . . . The court must then determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. . . . [T]he court should recognize that counsel is strongly presumed to have rendered adequate

8

assistance and made all significant decisions in the exercise of reasonable professional judgment.

Strickland, 466 U.S. at 689-90, 104 S.Ct. at 2065-66.

### a. Lack of Preparation and Investigation for Sentencing Phase

Williams asserts that his attorneys did not adequately investigate and prepare for the sentencing phase of his trial and, as a result, presented no evidence in mitigation of his guilt of capital murder. Williams claims that trial counsel should have put on various witnesses who could have testified to positive aspects of Williams's character. Additionally, Williams claims that his trial counsel "never made an independent examination of the facts and circumstances involved." Williams's contentions are not supported by the record.

At trial, Williams was represented by Allan Manka and Michael Callahan, both of whom were experienced capital trial counsel and both of whom testified at the state habeas proceeding. Manka and Callahan were sensitive to the fact that the state had an extremely strong case against Williams. Consequently, after his indictment, both Manka and Callahan encouraged Williams to accept the state's plea bargain, which he refused to do.[1] After interviewing Williams and family members at length, counsel decided not to pursue defenses based upon alibi, insanity, or self-defense because their investigation provided no reasonable basis for doing so. They made a strategic

---

[1] The state offered to drop all charges against Williams for the gas station murder and give Williams a life sentence in exchange for a guilty plea for the Circle K murder.

9

decision to direct their attention to the punishment phase of Williams's case.

Both Manka and Callahan were aware of the use of character witnesses to mitigate punishment. However, they were also aware of Williams's juvenile crime record, drug and alcohol abuse history, gang association, violence against his family, and, as they put it, various other problems. They were legitimately concerned that any mitigating testimony would have been presented by witnesses whose knowledge would have opened the door to more damaging evidence under cross-examination.

This court has upheld decisions of counsel not to put on evidence in mitigation of culpability when the decision results from a strategic choice. See King, 1 F.3d at 284. In Williams's case, these decisions by counsel were well thought through tactical decisions. A court might even disagree with such a decision, viewing the case in hindsight, and still determine that the decision was not so seriously inept as to have been professionally unreasonable. In this case, we do not gainsay the decision of Williams's attorneys. Their decision to forego the presentation of mitigation witnesses cannot be said to be professionally deficient performance. The first prong of the Strickland analysis is not satisfied.

### b. Failure to Object During Voir Dire Regarding Strikes for Cause

Williams also claims that he received ineffective assistance of counsel because venire members Salazar, Flores, and Castillo were improperly excused for cause and counsel did not

object.  During <u>voir dire</u>, venire member Salazar stated that she was opposed to the death penalty and would be unable to set aside her personal beliefs in order to answer the special issues based on the evidence presented at Williams's trial.[2]  Venire member Flores stated that she would not be able to inflict the death penalty in any case.[3]  Similarly, venire member Castillo stated

---

[2]   Venire member Trinidad Salazar testified, in relevant part, under <u>voir dire</u> examination as follows:

[Q. By Mr. Callahan, defense attorney]:   Now, my question to you is could you set aside your opposition to the death penalty and answer these questions just based on the evidence as you have heard, and could you do that, or would you feel -- could you do that, answer those questions based just on the evidence?

A:   Well, I don't know.  I don't think I will be able to do it.

The Court:      You don't think you could answer yes?

Mrs. Salazar:    No, sir.

SOF IX:18.

[3]   Venire member Juanita Flores testified, in relevant part, under <u>voir dire</u> examination as follows:

The Court:  [I]f a defendant is convicted of capital murder, he can be punished by death or life imprisonment.  Those are the two punishments.  Now, bearing that in mind, will that affect you in your deliberations?

[A]:      I don't think I could pass judgment.  I would be nervous and scared.

The Court:  Are you conscientiously opposed to the death penalty?

[A]:      Yes.

The Court:  You are?  Okay.  Let me ask you this:  Could you in a capital case, capital murder case, could you ever inflict the death penalty, no matter how cruel, how heinous, how awful, how terrible the case may be?  Could you ever vote to inflict the death penalty?

[A]:      I don't think I could.  I don't think I could decide whether to have a man's life on my hands.

The Court:  Now, let me ask you if you will give me a yes or no answer.  Could you in any case, no matter how heinous, how terrible, how awful

11

that she would not be able to impose the death penalty under any circumstances.[4]

---

the case might be, could you in any capital murder case inflict
the death penalty?

[A]:        I don't think so, no.

SOF XII:  102-03.

[4]        Venire member Maria Castillo, in relevant part, under <u>voir dire</u>
examination testified as follows:

The Court:  In a capital case there are two optional punishments.  If the
            Defendant is found guilty of capital murder, his punishment will
            be life in prison or death.  Do you understand that?

[A]:        Right.

The Court:  Knowing that, is that going to affect your deliberations when you
            determine what the facts in the case are?  Will that affect you?

[A]:        Well, it will because I don't believe in the death penalty.

The Court:  You don't believe in the death penalty?

[A]:        Right.

The Court:  You would not under any -- let me ask you this:  would you
            consider assessing the penalty of death in any case, no matter how
            vicious or how bad it might be?

[A]:        It would -- it would have to be very bad.  I really don't think
            so, no.

The Court:  Well, you have answered it two different ways.  First you said
            that you would if it was bad enough, and then you said it would
            depend.

[A]:        It would take a lot out of me to do it.

The Court:  Well, I want you in your own mind to imagine the worst possible
            capital murder, the worst possible type of murder which was a
            capital offense, say a murder committed during the course of the
            commission of a robbery by the defendant, not this particular
            case, but just imagine some terribly brutal, vicious murder.  Now,
            would you consider assessing a death penalty in the most brutal
            type of murder that you can imagine?

[A]:        No, I don't feel I could.

The Court:  You would not?

[A]:        No.

The Court:  Not under any circumstances?

12

A venire member is properly excused for cause in a capital case when his "views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath."  Wicker v. McCotter, 783 F.2d 487, 493 (5th Cir.) (quotations and footnotes omitted) (quoting Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852 (1985)), cert. denied, 478 U.S. 1010 (1986).[5]

> It is a test to be applied primarily by the trial court, for determinations of juror bias depend in great degree on the trial judge's assessment of the potential juror's demeanor and credibility, and on his impressions about that venireman's state of mind.  The trial court's determination that a prospective juror could not perform his statutory function faithfully and impartially is accorded a presumption of correctness under 28 U.S.C. § 2254(d).

Id.

It is not for this court to substitute its judgment for that of the state trial court on this issue.  See id.  The record supports the trial judge's decision to remove each of these venire members for cause.  Moreover, the fact that there were no objections to the removal of these venire members for cause may very well support the propriety of the court's decisions:

> [N]o one in the courtroom questioned the fact that [the venire members'] beliefs prevented [them] from sitting.  The reasons for this, although not crystal clear from

---

[A]:      No, I don't think so.

SOF IV:125-27.

[5]     Williams claims that Wicker and Witt are not applicable to his case because they were decided after his conviction.  He argues that only Adams and Witherspoon are applicable.  However, Wicker and Witt serve only to clarify Adams and Witherspoon; they do not create new law.  See Riles v. McCotter, 799 F.2d 947, 950 (5th Cir. 1986).  Therefore, they are applicable and useful in this discussion.

13

> the printed record, may well have been readily apparent to those viewing [the venire members] as [they] answered the questions.

Wainwright v. Witt, 496 U.S. 412, 435, 105 S.Ct. 844, 857–58 (1985).

Counsel unsuccessfully attempted to rehabilitate venire member Salazar and did not attempt to rehabilitate venire members Flores and Castillo. The record suggests that any attempts at rehabilitation would have been futile because these venire members would not have been able to function properly as jurors in this capital case. Accordingly, counsel's decision not to rehabilitate these venire members or to object to their removal for cause cannot be said to be deficient performance. See Bridge v. Lynaugh, 838 F.2d 770, 776 (5th Cir. 1988); Moore v. Maggio, 740 F.2d 308, 317 (1984), cert. denied, 472 U.S. 1032 (1985). Because counsel's performance was not deficient, Williams does not satisfy the first requirement of Strickland on this issue and his argument fails.[6]

---

[6] Williams also claims that his due process and equal protection rights were violated in the federal evidentiary hearing when the judge did not permit him to secure the testimony of the state trial judge. Williams sought to question Judge Butler regarding his reasons for dismissing venire member Castillo for cause. This claim is without merit. A trial judge is not required to write out in separate memorandum his specific findings on each juror excused. See Witt, 469 U.S. at 430, 105 S.Ct. at 855. Neither is he required to indicate for the record his reasoning for dismissing a venire member for cause. See id. As discussed supra, the record clearly supports Judge Butler's decision to remove venire member Castillo for cause. We find no error.

14

## c.  Failure to Request Psychiatric Examination

Williams also complains that he was afforded ineffective assistance of counsel because Manka and Callahan did not request a psychiatric examination to aid in the presentation of "mitigating evidence" of insanity, duress, and emotional disturbance.  Williams does not allege that he had any defense against a guilty verdict based on these theories.  Williams's only professional "proof" that he lacked a dangerous character is supplied in the inconclusive affidavit of Dr. Sparks, the Chief Bexar County Psychiatrist at that time, who never examined Williams and could only speculate about his condition from records furnished by habeas counsel.

Counsel made a knowing, strategic decision not to seek a psychiatric evaluation of Williams because they feared the state would use rebuttal psychiatric testimony of Williams's future dangerousness.  This was not a frivolous concern.  The state properly criticizes Williams for simply second-guessing counsel's performance without having any evidence to support their criticism.  The fact that his counsel did not request a psychiatric examination does not constitute deficient performance.  Williams's Strickland argument fails on this issue.

## d.  Failure to Object or Limit the Testimony of the Victim's Mother

Williams next complains that he received ineffective assistance of counsel because his counsel did not object or try to limit the testimony of the victim's mother.  At trial, Danny Liepold's mother testified for what amounted to three pages of

15

trial transcript. She identified her son as the victim and testified emotionally but briefly about his trusting nature.

It is unlikely that counsel's passivity when confronted with this witness represented a deficient performance because counsel made a strategic choice not to object, recognizing the "delicacy" of how to handle testimony of a victim's relative. Counsel wanted Mrs. Liepold's testimony to conclude as quickly as possible and without contentiousness. Moreover, her testimony was probably admissible anyway for its explanation why Danny trustingly turned his back on Williams, whom he knew, before being shot. For all these reasons, the discussion whether to object was a close call professionally.

But, in any event, Williams has not satisfied the second prong of Strickland: he cannot establish prejudice. It is clear from the record that the exclusion of Mrs. Liepold's brief testimony would not have affected the outcome of Williams's case. The evidence of guilt was overwhelming, and the testimony at the punishment phase of his trial, which included evidence of the gas station murder, was compelling. Williams has not satisfied the prejudice prong of Strickland because of counsel's failure to exclude the testimony of Mrs. Liepold.

### 2. Appeal

Williams also complains that he received ineffective assistance on his appeal by Allan Manka, one of his trial attorneys. In his brief to this court, Williams states that his counsel "failed to raise important issues on appeal, including

16

but not limited to:  ineffective assistance of counsel; introduction of inflammatory and prejudicial evidence such as the testimony of the victim's mother; introduction of the decedent's high school yearbook photograph; prejudicial and inflammatory remarks by the prosecutor during arguments at the punishment phase of the trial; Witherspoon/Adams challenges [to the venire members]; voluntariness of the confession; illegal arrest and failure of the state to prove ownership of the property."

The due process clause of the fourteenth amendment guarantees effective assistance of counsel for direct appeals as of right.  See McCrae v. Blackburn, 793 F.2d 684, 688 (5th Cir.) (citing Hamilton v. McCotter, 772 F.2d 171, 182 (5th Cir. 1985)), cert. denied, 479 U.S. 965 (1986).  That right to effective appellate counsel must pass the Strickland standards.  See id. Williams must demonstrate that (1) his appellate counsel's performance was so deficient as to fall below objectively reasonable conduct of appellate counsel and (2) his case was prejudiced as a result.

As we have already determined that Williams's ineffective assistance of trial counsel claim, including his claim regarding the testimony of the victim's mother, is without merit, Williams could not have prevailed on that issue on appeal. Similarly, Williams's claims regarding strikes for cause of venire members and the voluntariness of his confessions, discussed infra, are without merit.  Accordingly, on these issues, Williams necessarily cannot satisfy the second prong of

17

Strickland, namely that he was prejudiced because these issues were not raised on appeal.

Williams's remaining claims of appellate counsel's failure are burdened either by lack of factual specificity or by the inherent legal weakness of the claims of alleged error. Appellant has not shown prejudice from the failure to pursue on appeal any of the remaining issues.

## C. Mitigating Instruction for Williams's Youth

Williams complains that the special issues that the jury was required to answer during the punishment phase[7] did not enable the jury to give adequate mitigating effect to Williams's youth at the time of the offense. Williams was nineteen years old when he murdered Liepold.

The Supreme Court has recently concluded that the Texas statutory scheme under which Williams was sentenced allows the jury to give mitigating effect to the defendant's age. See Johnson v. Texas, ___ U.S. ___, ___, 113 S.Ct. 2658, 2669-70 (1993). A failure to supplement the special issues, as Williams urges, to give effect to the mitigating effect of age at the

---

[7] The jury was required to answer the following special issues at the sentencing phase of Williams's trial:

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result; and,

(2) whether there is a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

Tex. Code Crim. Proc. Ann. art. 37.071(b).

18

punishment phase does not amount to a constitutional defect. Moreover, any ruling by this court to the contrary would require the application on habeas review of a new rule of criminal law in violation of Teague v. Lane, 489 U.S. 288, 109 S.Ct 1060 (1989) (plurality).  See Graham v. Collins, ___ U.S. ___, 113 S.Ct. 892 (1993).  Williams was not entitled to an additional instruction to the jury regarding the mitigating effect of his age.

### D.  Questioning During Voir Dire
### Regarding Range of Punishment

Venire member Lindley was questioned during voir dire by the prosecution regarding whether he could make a judgment as to whether a person would commit acts of violence in the future. Lindley testified that he could.  Upon examination by Williams's counsel, Lindley was asked, "[W]hat degree of probability or what degree of reliability can you attach to, say, in your own judgment the probability that a person will continue to act a certain way in the future?"  The prosecution objected to this question, and the objection was sustained.  Defense counsel then asked, "How reliable would your determination be [regarding a person's continuing to commit criminal acts of violence] in your own mind?"  The prosecution again objected, and the objection was again sustained.

Williams now complains that he was denied due process, equal protection, a fair trial, and effective assistance of counsel because the trial court refused to allow him to question this venire member regarding range of punishment, depriving

19

Williams of the opportunity intelligently to exercise his peremptory strikes.  This argument is without merit.

First, we agree with the district court that, ordinarily, questioning a venire member regarding the range of punishment raises only an issue of state criminal procedure that does not present a federal constitutional claim.  See Moreno v. Estelle, 717 F.2d 171, 179 (5th Cir. 1983), cert. denied, 466 U.S. 975, (1984).

Second, it is difficult to see how the vague, open-ended questions asked by defense counsel could have elicited any enlightening response from this venire member.  Manka went on to question Lindley in detail regarding his duties as an educator and the potential effect of education on future lifestyle.  Manka then accepted Lindley as a juror.  Defense counsel's failure to obtain two specific answers, moreover, given an otherwise thorough voir dire examination, was not such a critical deficiency in the trial as to deprive Williams of fundamental fairness in the exercise of peremptory strikes.  This error, if it was one, is different from the judge's unkept promise on voir dire in Knox v. Collins, 928 F.2d 657, 661-62 (5th Cir. 1991).

### E.   Testimony of Trial Jurors at the Federal Evidentiary Hearing

Williams next complains that the federal district court abused its discretion by not allowing testimony from trial jurors at the evidentiary hearing.  His counsel requested to have the state jurors testify as to whether their deliberations would have been different if they had been presented with the mitigating

evidence that was allegedly available, but not presented at trial.  This argument is without merit.

The post-verdict inquiry of jury members, as live witnesses or by affidavit, is inappropriate and precluded by Federal Rules of Evidence 606(b).[8]  <u>See</u> <u>Byrne v. Butler</u>, 845 F.2d 501, 509-10 n.8 (5th Cir.), <u>cert. denied</u>, 487 U.S. 1242 (1988); <u>McQueen v. Blackburn</u>, 755 F.2d 1174, 1178-79 (5th Cir.), <u>cert. denied</u>, 474 U.S. 852 (1985).  The district court did not abuse its discretion in disallowing this requested testimony.

### F.  Magistrate Judge's Alleged Conflict of Interest

Williams complains that Magistrate Judge Boyd, who conducted the federal habeas evidentiary hearing, had a conflict of interest because he went to work for the state district attorney's office after the evidentiary hearing in January 1988.  In March of 1988, Boyd recused himself from Williams's case because of his impending retirement in June.  Williams's case was then taken over and actually decided by Magistrate Judge Robert O'Connor on two separate occasions, by then-District Judge Emilio Garza, and by District Judge Edward Prado.

---

[8]     Federal Rule of Evidence 606(b) provides:

Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror.  Nor may a juror's affidavit or evidence of any statement by the juror concerning a matter about which the juror would be precluded from testifying be received for these purposes.

Fed. R. Evid 606(b).

Williams does not explain the ways in which Magistrate Judge Boyd was biased against him or how this alleged conflict of interest prejudiced Williams's case. From the record, there does not appear to have been an appearance of impropriety which rose to the level of a fundamental defect. See United States v. Couch, 896 F.2d 78, 81 (5th Cir. 1990). There was no harm to Williams's case as a result of Magistrate Judge Boyd's participation in these proceedings.

## G. Statutory Maximum for Payment of Investigators

At the time of Williams's trial, the Texas Code of Criminal Procedure placed a $500 limit for reimbursement for costs of court-appointed investigators.[9] Williams claims that he was deprived of equal protection, due process, and effective representation because this provision was unconstitutional on-its-face and as applied to Williams.

It is well settled that the due process clause does not require a state to pay for the same assistance that a wealthier defendant might buy, see Ake v. Oklahoma, 470 U.S. 68, 77, 105 S.Ct. 1087, 1093 (1985), and the equal protection clause does not require that indigent defendants have precisely the same advantages as non-indigent defendants, see Ross v. Moffitt, 417 U.S. 600, 611-12, 94 S.Ct. 2437, 2444-45 (1974). This statute was not unconstitutional on its face.

_____

[9] This provision now allows for recovery for reasonable expenses. See Tex. Code Crim. Proc. Ann. art. 26.05.

Moreover, the investigation in Williams's case exceeded the $500 limit, as it cost over $900. Additionally, the trial judge who presided over Williams's case stated in the state habeas proceeding that in Williams's case, as in all capital cases, it is his policy to furnish investigators with unlimited funds. Williams's investigative costs of over $900 were reimbursed. Williams has made no attempt to show that his defense was adversely affected by the $500 limit, nor can he point to any specific evidence that could have been obtained that was not obtained as a result of this statutory cap. We reject this contention.

## H. Alleged Variance Between Indictment and Proof at Trial

Williams next complains that there was a fatal variance between the indictment and the proof at trial. The indictment charged Williams with causing the death of Danny Liepold "while in the course of committing and attempting to commit the offense of robbery upon the complainant." Williams argues that because the proof at trial unequivocally established that Williams was robbing the convenience store, not Danny Liepold, this creates a fatal variance between the indictment and the proof at trial.

The sufficiency of a state indictment is appropriate for federal habeas relief only when the indictment is so deficient that the convicting court was without jurisdiction. See Yohey v. Collins, 985 F.2d 222, 229 (5th Cir. 1993). State law dictates whether a state indictment is sufficient to confer a court with jurisdiction. See id. Texas law provides that it is the preferred practice for an indictment to allege ownership in a natural person

23

acting for the corporation rather than in the corporation itself. See Dingler v. State, 705 S.W.2d 144, 145 (Tex. Crim. App. 1984). Williams's indictment did just that. Because the state court had jurisdiction under the indictment, the federal court had no basis for granting habeas relief.

## I. Applicability of Stone v. Powell

Williams next complains that the federal magistrate judge erred in finding that Williams's fourth amendment claims were barred by Stone v. Powell, 428 U.S. 465, 96 S.Ct. 3037 (1976). Williams is wrong in his assertion. Powell provides:

> where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial.

Powell, 428 U.S. at 494, 96 S.Ct. at 3052 (footnotes omitted).

> [A] federal court need not apply the exclusionary rule on habeas review of a Fourth Amendment claim absent a showing that the state prisoner was denied an opportunity for a full and fair litigation of that claim at trial and on direct review.

Id., 428 U.S. at 494 n.37, 96 S.Ct. at 3052-53 n. 37.

Williams does not argue that he was denied a full and fair opportunity for litigation of his fourth amendment claim, although he did not pursue it on direct appeal. Moreover, the record indicates that Williams's motions to suppress were presented to and addressed by the trial court. This claim is unfounded.

24

## J.  Voluntariness of the Confessions

Williams's final complaint is that the confessions with which he provided the police were unconstitutionally obtained.  He complains that he was suffering from diminished capacity at the time of the confessions and that he was forced into confessing by coercive behavior exercised by the police.  These claims are without support in the record.

All of the police officers who spoke with Williams the morning of his arrest were experienced in detecting drug or alcohol usage, yet neither they nor Williams's father testified that he appeared to be impaired in any way.  Williams cites only one instance of police duress, alleging that the arresting officer who awoke Williams, "got on top of him," got him out of bed, and had Williams sit on the bed and talk.  The officer read Williams his rights, and at that time, Williams denied any involvement in the robbery.  The record clearly supports the finding that Williams was advised of his rights before he was permitted to give any of his three confessions.  Additionally, there is plenty of support in the record for the finding that Williams's confessions were not the product of duress.  For these reasons, we agree with the state and federal courts that the confessions were not obtained in violation of Williams's constitutional rights.

## III.  CONCLUSION

For the foregoing reasons, this court AFFIRMS the denial of Williams's petition for federal writ of habeas corpus.

25