Walter **BELL**, Jr., Petitioner,

v.

James A. **LYNBAUGH**, Interim Director, Texas Department of Corrections, Respondent.

No. B–87–401–CA.

United States District Court, E.D. Texas, Beaumont Division.

June 3, 1987.

---

Edward M. Chikofsky, New York City, for petitioner.

Paula C. Offenhauser, Asst. Atty. Gen., Enforcement Div., Austin, Tex., for respondent.

## MEMORANDUM OPINION AND ORDER

HALL, District Judge.

Walter Bell, Jr., by way of Petition For Writ Of Habeas Corpus, contends that his incarceration for the murder of Ferd Chisum is unlawful, under the Fifth, Sixth, Eighth and Fourteenth Amendments to The United States Constitution. Specifically, Bell challenges his detention based on: the admission of his second confession; the exclusion of a prospective juror in violation of *Witherspoon;* the inclusion of two (2) jurors who were strikable for cause; the denial of a change of venue; the denial of further voir dire regarding mid-trial publicity; violations of his speedy trial rights; improper prosecutorial argument; and ineffective assistance of counsel. After having meticulously reviewed the pleadings, briefs, and the state court record, and after holding an evidentiary hearing, the Court concludes that Bell's restraint is constitutional, and that the Petition For Writ Of Habeas Corpus should therefore be denied.

## I.

Ferd and Irene Chisum were found dead in the bathtub of their home on the morning of Friday, July 19, 1974. A District Attorney's investigation led to the arrest of Walter Bell, Jr., at approximately 1 a.m., on Saturday, July 20, 1974, at which time *Miranda* warnings were given. Bell confessed to the murders after officials confronted him with certain physical evidence found at his home pursuant to an authorized search. The District Attorney's investigator then made a typewritten statement of the confession, which Bell signed. Subsequently, Bell was charged with capital murder.

On Sunday morning, July 21, 1974, shortly after Bell had visited with his parents, he initiated contact with the District Attorney's investigator, and gave a second confession. The second confession contained admissions that he had robbed the Chisums and raped Mrs. Chisum.

The record reflects that:

"[Petitioner] carried with him to the Chisums' house an 'equipment kit', with a sharpened knife, handcuffs, and an electrical cord with the ends cut off. He gained entry to their home under a pretext, and discussed with Mr. Chisum [his former employer] the possibility of getting into mechanic's school. He then pulled a knife on Chisum, put the cuffs on him, bound his feet and put him in a closet. [Petitioner] next found Mrs. Chisum and attempted to gag her and tie her up, but when Mr. Chisum escaped from the closet, [Petitioner] stabbed him in the chest and retied him. After that,

he untied Mrs. Chisum's legs, made her remove her brassiere and panties, and raped her. He then forced her to write out some checks, hit her in the jaw, and attempted to choke her to death with a towel. He dragged her into the bathroom, where she struggled, but he succeeded in killing her. [Petitioner] then returned to Mr. Chisum, choked him, dragged him to the bathtub and stabbed him again in the abdomen."

*Bell v. State*, 724 S.W.2d 780, 804 (Tex. Crim.App.), cert. denied, —— U.S. ——, 107 S.Ct. 910, 93 L.Ed.2d 860 (1987).

Bell was indicted in July of 1974 for both murders. He was first tried and convicted of Irene Chisum's murder in December, 1974. On March 11, 1982, after an eight (8) day trial, a jury found Bell guilty of Ferd Chisum's murder (Tr. I 273; SOF. XVIII 4472, 1.4–5) and answered affirmatively the special issues necessary for the imposition of the death penalty under TEX.CODE CRIM.PROC.ANN., art. 37.071(b) (Vernon Supp.1987).[1] (Tr. I 276; SOF. XVIII 4545–4546). Written findings of fact and conclusions of law were filed by the Trial Court on May 31, 1983. (Tr.Supp. I 13–18). The conviction was affirmed by the Texas Court of Criminal Appeals in *Bell*, id.

Bell was scheduled to be executed on March 25, 1987. After the state courts had denied Bell a stay of execution, the instant habeas corpus action was filed on March 20, 1987. This Court entered a stay of execution on March 23, 1987, in order to thoroughly review Petitioner's petition for a habeas relief.

---

**1. Art. 37.071. Procedure in capital case**

(a) Upon finding that the defendant is guilty of a capital offense, the court shall conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to death or life imprisonment....

(b) On conclusion of the presentation of the evidence, the court shall submit the following three issues to the jury:

(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

(2) whether there is a probability that the defendant would commit criminal acts of vio-

lence that would constitute a continuing threat to society; and

(3) if raised by the evidence, whether the conduct of the defendant in killing the deceased was reasonable in response to the provocation, if any, by the deceased.

⋆ ⋆ ⋆ ⋆

(e) If the jury returns an affirmative finding on each issue submitted under this article, the court shall sentence the defendant to death. If the jury returns a negative finding on or is unable to answer any issue submitted under this article, the court shall sentence the defendant to confinement in the Texas Department of Corrections for life.

⋆ ⋆ ⋆ ⋆ ⋆ ⋆

## II.

### Habeas Guidelines

■ Federal habeas courts are not empowered to review every issue raised by a state prisoner. Federal courts do not sit as courts of appeal and error for state court convictions [*Dillard v. Blackburn*, 780 F.2d 509, 513 (5th Cir.1986) ] but may intervene in state criminal judicial process only to correct errors that offend the laws, treaties or Constitution of the United States. *Wainwright v. Goode*, 464 U.S. 78, 104 S.Ct. 378, 382, 78 L.Ed.2d 187 (1983); 28 U.S.C.A. § 2254(a) (1977).

■ Under 28 U.S.C.A. § 2254(d) (1977), the factual findings of a state's trial and appellate courts "*shall* be presumed to be correct" (absent one of eight (8) statutory conditions negating the presumption) "if they are 'fairly supported' by the record". (Emphasis added). *Marshall v. Lonberger*, 459 U.S. 422, 432, 103 S.Ct. 843, 850, 74 L.Ed.2d 646 (1983); *Peek v. Kemp*, 784 F.2d 1479, 1483 (11th Cir.1986); *Woods v. Armontrout*, 787 F.2d 310, 313 (8th Cir.), cert. denied, — U.S. —, 107 S.Ct. 890, 93 L.Ed.2d 842 (1987). The presumption of correctness requires that federal courts accord a "high measure of deference" to the state courts' factual findings. *Marshall*, 459 U.S. at 432, 103 S.Ct. at 850; *Sumner v. Mata*, 449 U.S. 539, 101 S.Ct. 764, 66 L.Ed.2d 722 (1981); *Dunn v. Maggio*, 712 F.2d 998, 1001 (5th Cir.), cert. denied, 465 U.S. 1031, 104 S.Ct. 1297, 79 L.Ed.2d 697 (1984). A federal court is not permitted to disregard a state courts' factual finding based on mere disagreement. Rather, for the presumption to dissolve, the federal habeas statute requires a determination that the state's findings "lacked even 'fair support' in the record". *Marshall*, 459 U.S. at 432, 103 S.Ct. at 850. This rule of deference to factual findings is undoubtedly rooted in a recognition that a state court's predominant function in determining facts often rests on credibility judgments whose basis cannot be discerned from a cold record. *Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 854–855, 83 L.Ed.2d 841 (1985); *Wicker v. McCotter*, 783 F.2d 487, 493 (5th Cir.), cert. denied, — U.S. —, 106 S.Ct. 3310, 92 L.Ed.2d 723 (1986); *Branch v. Estelle*, 631 F.2d 1229, 1233 (5th Cir.1980).

Professors LaFave and Israel note the following additional rationales for applying the presumption of correctness to factual findings as opposed to legal conclusions:

"It has been argued that there is less need for independent federal factfinding because the trial judge's 'guilt determining momentum' and 'judicial loyalty to state institutional interests' are not as likely to influence the accuracy of his factfindings as they are to impair his application of constitutional standards. Arguably also, any value that federal procedures and federal judges would bring to the accuracy of the factfinding process is more than offset by the timing advantage of the state court hearing, as compared to a federal habeas hearing typically held long after the events in question occurred. Finally, it is generally agreed that independent federal factfinding exacerbates many of the costs of habeas review, extending substantially the call on scarce judicial resources and increasing the friction between state and federal courts". W.R. LaFave and J.H. Israel, Criminal Procedure § 27.6(a), p. 1056 (1985).

■ To overcome the presumption of correctness, *it is the Petitioner's burden* to show, *by convincing evidence*, that the state courts' factual finding is in error. *Sumner*, 449 U.S. at 550, 101 S.Ct. at 770; 28 U.S.C.A. § 2254(d) (1977).

■ The presumption of correctness does not attach to state court findings that are pure legal conclusions or involve mixed questions of law and fact. *Hayes v. Kincheloe*, 784 F.2d 1434, 1437 (9th Cir.1986); *DeAngelo v. Wainwright*, 781 F.2d 1516, 1518 (11th Cir.), cert. denied, — U.S. —, 107 S.Ct. 444, 93 L.Ed.2d 392 (1986). Federal courts must engage in an independent and non-deferential review of a state courts' conclusions of law. *Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 450–453, 88 L.Ed.2d 405 (1985); *Brantley v. McKaskle*, 722 F.2d 187, 189 (5th Cir.1984).

However, as to the "subsidiary factual questions" found by the state court in support of its conclusions of law, the presumption of correctness applies. *Miller*, 106 S.Ct. at 451; *Sumner v. Mata*, 455 U.S. 591, 102 S.Ct. 1303, 71 L.Ed.2d 480 (1982). For example, some subsidiary factual findings entitled to the presumption of correctness regarding the voluntariness of a confession might include: determinations as to the length and circumstances of the interrogation; whether or not Miranda warnings had been given to the defendant; and whether or not a drug administered to the defendant had the properties of a truth serum. *Miller*, supra; *Townsend v. Sain*, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963); *Ahmad v. Redman*, 782 F.2d 409, 413 (3rd Cir.1986). An issue does not lose its factual character merely because its resolution is dispositive of the ultimate constitutional question. *Miller*, 106 S.Ct. at 451.

Applying the abovementioned limiting principles, the Court has found the state courts' factual findings to be more than "fairly supported by the record". Furthermore, Petitioner has not shown by convincing evidence that any of the state courts' factual findings is in error. Accordingly, as required, those findings, which constitute the factual underpinnings of the state courts' conclusions of law, have been presumed to be correct. Upon independent consideration of said conclusions of law, this Court is in full agreement with the state courts' position: that none of the alleged constitutional violations of Bell's rights is meritorious.

## III.

### A. The Confession

Petitioner contends that his second confession should have been suppressed on two grounds: 1) as the tainted fruit of an illegal warrantless arrest; and 2) as involuntary based on his mental retardation.

#### 1. Fruit Of The Poisonous Tree

Bell claims that his second confession should have been suppressed as the tainted fruit of an illegal warrantless arrest.

Under *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976), federal habeas review of Bell's Fourth Amendment claim is barred because the issue was litigated in the state courts. The Stone Court's rationale is to avoid the substantial societal costs which would be inherent in allowing a federal habeas case, since further application of the exclusionary rule by the federal courts would contribute little, if nothing, to the perpetuation of Fourth Amendment values, once a state prisoner has already had the opportunity to have his claim reviewed. *Stone*, 428 U.S. at 495, 96 S.Ct. at 3053. *See also: Davis v. Blackburn*, 803 F.2d 1371 (5th Cir.1986) (per curiam); *Morgan v. Estelle*, 588 F.2d 934 (5th Cir.1979); *Caver v. State of Ala.*, 577 F.2d 1188, 1191–1192 (5th Cir.1978); *O'Berry v. Wainwright*, 546 F.2d 1204, 1209–1212 (5th Cir.), cert. denied, 433 U.S. 911, 97 S.Ct. 2981, 53 L.Ed.2d 1096 (1977). The Stone rule applies even if the state court's decision is incorrect. *Williams v. Brown*, 609 F.2d 216, 220 (5th Cir.1980).

#### 2. Mental Retardation

Petitioner contends that the following factors render his second confession involuntary: His "subnormal intelligence"; the confession having been "composed" by the police; and his having been "deprived of access to his parents for two (2) days after his arrest". Respondent counters that the state court's subsidiary factual findings, which are entitled to a presumption of correctness [*Miller*, 106 S.Ct. at 450; *Wicker*, 783 F.2d at 498] support the conclusion that Bell's confession was voluntary.

In *Jurek v. Estelle*, a highly divided Fifth Circuit Court of Appeals held a mental retard's second police composed confession inadmissible on Fifth Amendment grounds, where the accused had been held incommunicado during the forty-two (42) hour period in which his confessions were given. *Jurek v. Estelle*, 623 F.2d 929 (5th Cir.) (en banc), cert. denied, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981). Bell cites *Jurek* for the proposition that similar

factors show that his confession was involuntary. This Court does not agree.

■ The test for determining the voluntariness of a confession is whether or not, under *the totality* of the circumstances, the accused, possessing the capability to do so, made an independent and informed choice to confess of his own free will, his will not having been overborne by any pressures and circumstances swirling around him. *U.S. v. Rouco,* 765 F.2d 983, 993 (11th Cir.), cert. denied, — U.S. —, 106 S.Ct. 1646, 90 L.Ed.2d 190 (1986); *Paxton v. Jarvis,* 735 F.2d 1306, 1308 (11th Cir.), cert. denied, 469 U.S. 935, 105 S.Ct. 335, 83 L.Ed.2d 271 (1984); *Jurek,* 623 F.2d at 937.

■ The voluntariness test has been clarified by the United States Supreme Court in *Colorado v. Connelly,* — U.S. —, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Official coercion is a "necessary predicate" to a finding of involuntariness within the meaning of the due process clause of the Fourteenth Amendment [Id., 107 S.Ct. at 522] as well as under the Fifth Amendment. "The voluntariness of a waiver of this [Fifth Amendment] privilege has always depended on the absence of police overreaching, not on 'free choice' in any broader sense of the word". Id., 107 S.Ct. at 523.

■ The Courts have explicitly rejected Petitioner's subsidiary argument that an accused's mental deficit should be considered independent and apart from any police overreaching. Petition For Writ Of Habeas Corpus By A Person In State Custody, p. 10–11. At most, an accused's mental condition may be a "significant factor" in the voluntariness calculus. Id. 107 S.Ct. at 520. The Fifth Circuit has followed the Supreme Court's statement of the law to hold a petitioner's confession voluntary due to a lack of police coercion, even though a psychiatrist's affidavit stated that the prisoner suffered from mental retardation and psychosis which made the prisoner vulnerable to outside influences and to being easily led. *Reddix v. Thigpen,* 805 F.2d 506, 515–517 (5th Cir.1986). *See also: United States v. Gordon,* 812 F.2d 965, 968 (5th

Cir.1987); *United States v. Rohrbach,* 813 F.2d 142 (8th Cir.1987); *Agee v. White,* 809 F.2d 1487, 1495 (11th Cir.1987). In fact, the Court of Appeals for the Eleventh Circuit, citing *Connelly,* has held that even if a confession is the product of an accused's mental defect, absent allegations of police coercion, a *Jackson v. Denno* hearing to determine the voluntariness of the confession is not required. *United States v. Scheigert,* 809 F.2d 1532, 1533 (11th Cir. 1987) (per curiam).

The Jurek Case is consistent with *Connelly* and its progeny. The Jurek Court was confronted with overwhelming indicia of police oppression sufficient to support a conclusion of involuntariness: "evidence of a prosecutorial 'drive for the death penalty'" [*Jurek,* 623 F.2d at 940] as well as the continued police interrogation of an unrepresented accused despite his ambiguous "request" to consult with an attorney. Absent clear evidence of police overreaching, however, the Fifth Circuit would certainly have reached a different result in the Jurek Case.

■ The only allegation of police coercion this Court can construct from Bell's Petition is that since the Texas Court of Criminal Appeals held Bell's first confession inadmissible as the fruit of an illegal warrantless arrest, police misconduct must necessarily have infected Bell's second confession. This contention, however, ignores the fact that Bell's arrest was held illegal not based on police intimidation, but rather based on a failure to procure a warrant under the reasonable belief that there were exigent circumstances. Specifically, the officer, who had probable case to arrest Bell [*Bell,* 724 S.W.2d at 790], failed to procure a warrant because the bar where he found Bell was about to close, he could not have obtained a warrant before the bar closed, and he did not know where to find Bell once the bar closed. *Id.* at 787. The Texas Court of Criminal Appeals specifically noted that "the police conduct here certainly does not shock the conscience of this court". *Id.* at 790. Similarly, neither a police composed confession [Id. at 793] nor being separated from one's family for a

period, in and of themselves, constitute coercion.

 After a *Jackson v. Denno* hearing, the Trial Court made the following factual findings which support the conclusion of voluntariness: that prior to giving any statement, Bell was given Miranda warnings; that he gave his second confession after being taken before a magistrate; that he did so ... without being induced by any compulsion, violence, threats, tricks, promises, or persuasion; that he expressly waived his right to counsel; that he never requested to use the phone and that he gave his second confession *after* visiting with his mother and step-father; that *he initiated* the conversation leading to the second confession [Id. at 792–793; *See also: Connelly*, 107 S.Ct. at 518; *United States v. Chalan*, 812 F.2d 1302, 1308 (10th Cir.1987); *Jurek*, 623 F.2d at 939 (a factor cited by the Court in holding that Jurek's first confession was voluntary)]; and that he had ample intelligence, awareness, experience and mental capacity to understand and comprehend the contents of his confession and make an informed and understanding decision and waivers. (Tr.Supp. I 13–18). *Reddix*, 805 F.2d at 516–517.

To support the contention that his confession was the result of official coercion, Bell's Reply Memorandum highlights certain pretrial suppression hearing testimony: his own testimony (SOF. III 891–945); his mother's testimony (SOF. III 870–891, 951–955); and his step-father's testimony (SOF. III 945–951). However, at best this testimony conflicts with the state's testimony, and it was certainly within the province of the Trial Court to resolve that conflict in favor of the state. It being well settled that a federal habeas court cannot substitute its judgment for that of the trial court on questions of credibility [*Dunn*, 712 F.2d at 1001; *Maggio v. Fulford*, 462 U.S. 111, 103 S.Ct. 2261, 76 L.Ed.2d 794 (1983)], and there being more than "fair support" in the record for the Trial Court's findings [SOF. IIA 627–768; 775—III 837; XIV 3512–3513; 3543–3544, 1. 14; 3574–3577; 3579, 1. 24–25 —XV 3625, 1. 21; 3703, 1. 9—3604, 1. 14], the presumption of correctness attaches

thereto. *Smith v. White*, 815 F.2d 1401, 1407 (11th Cir.1987); *Brantley*, 722 F.2d at 189.

After having reviewed these findings, in light of the current constitutional jurisprudence, the Court reaches the inescapable conclusion that Bell's confession was voluntary. This point is therefore overruled.

### B. Jury Selection
#### 1. *Witherspoon v. Illinois*

Petitioner contends that the Trial Court committed reversible error in striking for cause a prospective juror, Ms. Beatrice Garcia, who expressed reservations about her ability to impose the death penalty. Bell claims that "the juror's voir dire responses ... appear ... sufficiently ambivalent [and] ambiguous ... to raise a serious question as to whether the juror expressed her opposition to the death penalty with the requisite degree of 'unmistakable clarity' as to warrant her exclusion from the jury".

 As the Supreme Court explained in *Wainwright v. Witt*, 105 S.Ct. at 844, 852–853, the original *Witherspoon* requirements for juror exclusion—beliefs which would cause "automatic" decisionmaking on the part of the juror as well as a demonstrated bias of "unmistakable clarity"— have been eliminated. *See also: Coleman v. Brown*, 802 F.2d 1227, 1231–1232 (10th Cir.1986). Rather, a juror may be excluded because of her views on capital punishment if those

"views would prevent or substantially impair the performance of [her] duties as a juror in accordance with [her] instructions and [her] oath". *Adams v. Texas*, 448 U.S. 38, 45, 100 S.Ct. 2521, 2526, 65 L.Ed.2d 581 (1980). "[Thus], the State may bar from jury service those whose beliefs about capital punishment would lead them to ignore the law or violate their oaths". Id., 448 U.S. at 50, 100 S.Ct. at 2529.

*See also: Wicker*, 783 F.2d at 493.

 The presumption of correctness applies to the state trial court's determination that a prospective juror's views on capital punishment would prevent or substantially

impair that person in the performance of his duties as a juror. This rule of deference is followed because the trial court's "predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from [a] record". *Witt*, 105 S.Ct. at 854–855. *See also: Wicker*, 783 F.2d at 493.

■ The Court finds ample testimony in the record to support the conclusion that Garcia's views would have substantially impaired her performance as a juror. (SOF. V 1287–1310). On examination by the state, prospective juror Garcia stated unequivocally that based on her religion she did not believe in the death penalty (SOF. V 1290–1291); that she would not assess a death sentence under any circumstances (SOF. V 1292–1293; 1301); and that she could not participate in a process which would result in a death sentence. (SOF. V 1299–1301). Although Garcia stated that she did not know whether or not there were any circumstances under which she could affirmatively answer the special issues necessary to impose death (SOF. V 1307), and that she might react differently if the victim had been a member of her own family (SOF. V 1309–1310), she reiterated that she would be unable to assess and would affirmatively oppose a sentence of death. Under nearly identical facts, the Fifth Circuit Court of Appeals has recently held the exclusion of a juror for cause to be proper. *Wilson v. Butler*, 813 F.2d 664, 675 (5th Cir.1987); *Williams v. Lynaugh*, 809 F.2d 1063, 1065–1066 (5th Cir.), cert. denied, —— U.S. ——, 107 S.Ct. 1635, 95 L.Ed.2d 207 (1987).

Because there is ample support in the record for the conclusion that juror Garcia was biased, applying the presumption of correctness, the Court holds that her exclusion for cause was proper. Accordingly, this point is overruled.

### 2. *Defendant's Failure To Testify*

Bell next challenges the Trial Court's refusal to strike for cause prospective juror Quida Branch, who was ultimately eliminated from the panel by peremptory strike. (SOF. V 1363—VI 1424) Branch's statements allegedly demonstrate her inability to follow the law regarding the burden of proof applicable in a criminal case, as well as the presumption of innocence.

■ In order to preserve the sanctity of the jury system, counsel must be afforded the opportunity to ferret out prejudice at every turn, through the maximum use of challenges. As a general rule, therefore, it is error for a court to force a party to exhaust his peremptory challenges on persons who are excludable for cause. *United States v. Nell*, 526 F.2d 1223, 1229 (5th Cir.1976). The central inquiry in determining whether or not a prospective juror should be excluded for cause is whether that individual holds particular beliefs or opinions that will prevent or substantially impair him in the performance of his duties as a juror under oath and as instructed. *United States v. Salamone*, 800 F.2d 1216, 1226 (3rd Cir.1986). If "actual prejudice" is shown, the court must grant a challenge for cause. *United States v. Apodaca*, 666 F.2d 89, 94 (5th Cir.), cert. denied, 459 U.S. 823, 103 S.Ct. 53, 74 L.Ed.2d 58 (1982). The question of individual juror partiality is, however, one of historical fact, entitled to a presumption of correctness on federal habeas review. *Patton v. Yount*, 467 U.S. 1025, 104 S.Ct. 2885, 2891–2893, 81 L.Ed.2d 847 (1984); *Wilcox v. Ford*, 813 F.2d 1140, 1150 (11th Cir.1987).

■ While Branch's testimony might indicate that the prospective juror was confused by the form of defense counsel's questions, this Court is unable to discern any evidence that her view of the presumption of innocence and the burden of proof was anything but correct:

"Q. And they come before you, would you require some proof of the accused in some manner prior to finding [him] not guilty?

A. Yes, because I believe, here, in this state, that you are innocent until you are proven guilty. Right? (SOF. VI 1395, 1. 13–18). (Examination by defense).

A. Well, I couldn't—You can't hold it against him if he doesn't testify in his own behalf. . . .

Q. So, in answer to the question, you would not hold the fact that he didn't testify or did not put on any evidence—you would not hold that against the Defendant? Is that correct?

A. That's right.

(SOF. VI 1399, 1. 19–21—1400, 1. 8–12). (Examination by state).

Q. If I understand you, are you saying that if a case is a 'serious case', such as Capital Murder.... against an accused, that that is the type of case that you would require a Defendant or an accused to bring forth some evidence in his own behalf?

A. I would like some, but if he didn't I think I could find him guilty, if we didn't have the evidence from him *and there was enough from the State."* (emphasis added).

(SOF. VI 1404, 1. 21—1405, 1.7). (Examination by defense).

The aforementioned testimony providing sufficient support in the record for finding Branch impartial and without "actual prejudice", applying the presumption of correctness, this point is overruled. *Patton,* 104 S.Ct. at 2891–2893; *Williams v. Lockhart,* 797 F.2d 344, 346 (8th Cir.1986). *See also: Simmons v. Lockhart,* 626 F.Supp. 872, 876–877 (E.D.Ark.), aff'd., 814 F.2d 504 (8th Cir.1987).

### 3. *Newspaper Reports*

Bell's final challenge to a venireperson is directed toward Ms. Helen Head. Like Branch, Head was not excused for cause but was dismissed on peremptory challenge. Petitioner points to Head's statement that she had a general impression that Petitioner was more guilty than not guilty, based upon her reading of a newspaper account. (SOF. IX 2430–2431).

■■■■ A venire member's previous knowledge of the facts of a crime through media reports is not dispositive of the issue of whether or not that person is qualified to sit as a juror. *United States v. Ebens,* 800 F.2d 1422, 1426 (6th Cir.1986); *United States v. Wilson,* 732 F.2d 404, 410 (5th Cir.), cert. denied, 469 U.S. 1099, 105 S.Ct. 609, 83 L.Ed.2d 718 (1984). Nor is a person

disqualified because he has a tentative opinion as to the defendant's guilt based on pretrial publicity. *United States v. Bliss,* 735 F.2d 294, 298 (8th Cir.1984); *United States v. Barber,* 668 F.2d 778, 786 (4th Cir.), cert. denied, 459 U.S. 829, 103 S.Ct. 66, 74 L.Ed.2d 67 (1982). Instead, the appropriate inquiry is whether or not the prospective juror can lay aside his or her impression, and render a verdict based solely upon the evidence presented. *United States v. Klacker,* 811 F.2d 555, 556 (11th Cir.1987) (per curiam); *Lincoln v. Sunn,* 807 F.2d 805, 815 (9th Cir.1987).

■■■■ This Court's review of the transcript reveals that Ms. Head's testimony was, that although she had read about the case in 1974, she was not too familiar with the facts (SOF. IX 2428, 2430) and would judge the case based solely on the evidence presented at trial. (SOF. IX 2397, 2431). This being at least fair support in the record for the Trial Court's finding Head impartial, that finding must be presumed to be correct. The Trial Court did not err, therefore, in overruling Bell's motion to strike for cause. Accordingly, this point is overruled.

### C. *Publicity*
#### 1. *Venue: Pretrial Publicity*

Bell complains that "the trial court erred in denying Petitioner a change of venue in light of substantial testimony presented as to widespread prejudicial feelings against Petitioner in Jefferson County".

The record reflects that on February 8, 1982, the "substantial testimony" to which Petitioner refers was presented to the Trial Court. (SOF. IV 1040–1114). A family friend, and the local president of the NAACP who was personally acquainted with Bell, testified generally that based on the many news articles they had seen about the crime, Bell could not get a fair trial in Jefferson County. Another defense witness testified that he had seen only a few newspaper articles, had heard no news conferences regarding the case (SOF. IV 1056), and that he could be fair and impartial. (SOF. IV 1055). No specific evidence

was offered such as the number, length or content of the articles published. The state's five (5) witnesses generally testified that Jefferson County's population was approximately 250,000 persons, that the news coverage had not been pervasive and that in their opinion, Bell could get a fair trial in Jefferson County. (SOF. IV 1073–1114).

Whether or not venue should be transferred based on prejudicial pretrial publicity is a decision committed to the sound discretion of the trial court. *United States v. Harrelson*, 754 F.2d 1153, 1159 (5th Cir.), cert. denied, 474 U.S. 1034, 106 S.Ct. 599, 88 L.Ed.2d 578 (1985). Widespread adverse publicity is not in itself grounds for a venue transfer. *Johnson v. Nix*, 763 F.2d 344, 347 (8th Cir.1985). Rather, a defendant must demonstrate *"actual* prejudice" to the extent that it is reasonably likely that a fair and impartial jury cannot be secured. *United States v. Cattle King Packing Co.*, 793 F.2d 232, 235 (10th Cir.), cert. denied, *Stanko v. United States*, —— U.S. ——, 107 S.Ct. 573, 93 L.Ed.2d 577 (1986); *United States v. Alvarez*, 755 F.2d 830, 859 (11th Cir.), cert. denied, *Hernandez v. United States*, 474 U.S. 905, 106 S.Ct. 274, 88 L.Ed.2d 235 (1985).

In addition to the "actual prejudice" standard, a defendant may show that he was entitled to a venue change based on "presumed prejudice", if he can demonstrate that highly inflammatory and intense media coverage so saturated the venire's community that it was virtually impossible to obtain an impartial jury. The presumed prejudice doctrine is, however, the exception and not the rule, being reserved for only the most "extreme" of situations. *Coleman v. Kemp*, 778 F.2d 1487, 1537 (11th Cir.), cert. denied, —— U.S. ——, 106 S.Ct. 2289, 90 L.Ed.2d 730 (1986); *Mayola v. State of Alabama*, 623 F.2d 992, 997 (5th Cir.), cert. denied, 451 U.S. 913, 101 S.Ct. 1986, 68 L.Ed.2d 303 (1981). *See also: Aldridge v. Marshall*, 765 F.2d 63, 67–68 (6th Cir.), cert. denied, 474 U.S. 1062, 106 S.Ct. 810, 88 L.Ed.2d 785 (1986).

The aforementioned testimony elicited at the venue hearing does not demonstrate either actual prejudice or a situation where prejudice should be presumed. Furthermore, much of the publicity occurred in 1974, eight (8) years prior to the time Bell was tried for the Mr. Chisum's murder. This substantial "cooling off" period between the commission of the crime and the trial, being suggestive of some slackening in the nature and extent of the publicity, could have led the state courts to conclude that "the feelings of revulsion that create prejudice [had] passed". *Coleman*, 778 F.2d at 1541, quoting *Patton*, 104 S.Ct. at 2891. This point is therefore overruled.

### 2. *Failure To Reopen Voir Dire: Mid-Trial Publicity*

Bell's next contention is that "the trial court's ... refusal to conduct individual inquiry of the jurors into their exposure to highly prejudicial news accounts appearing during the course of voir dire was fatally prejudicial". Specifically, Bell complains about the Trial Court's refusal to allow the further voir dire of the first seven (7) jurors when, after their selection, a newspaper article was published which quoted a federal judge as stating that Bell was guilty of Irene Chisum's murder. (Def. Exh. 4, SOF. XXI 4692). *See also:* Def. Exhs. 3, 5–6: SOF. 4691, 4693, 4694.

Petitioner has the same problem with this argument as he has with his pretrial publicity contention: mere conclusory allegations of prejudice do not demonstrate prejudice. Bell had many opportunities to show juror partiality: his defense counsel was afforded the opportunity to make a bill of exceptions (SOF. XII 3082, 1. 17–19); to question the jurors before the conclusion of the case (SOF. XII 3083, 1. 21–24); and to make a motion for new trial. *Bell*, 724 S.W.2d at 792 (motion for new trial proper state procedural vehicle for raising this claim). *See also: Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982). Without a showing of prejudice, how can it be said that the trial court erred in failing to reopen the voir dire? *Lowenfield v. Phelps*, 817 F.2d 285 at 296–297 (5th Cir.1987); *United States v.*

*Griley,* 814 F.2d 967, 974 (4th Cir.1987). The trial court has wide discretion in determining the scope and content of the voir dire, and absent a showing that the court has abused it's discretion resulting in prejudice to the accused, a conviction will not be disturbed on appeal. *Griley,* 814 F.2d at 974; *United States v. Black,* 685 F.2d 132, 134 (5th Cir.) (per curiam), cert. denied, 459 U.S. 1021, 103 S.Ct. 387, 74 L.Ed.2d 518 (1982).

The instructions of the Court and the Prosecution during the general voir dire and impanelment, that the jurors were not to read about or listen to anything concerning the case, were strong guarantors against prejudice due to mid-trial publicity. (SOF. V 1137, 1. 23—1138, 1. 5; 1156, 1. 22—1157, 1. 4; 1205, 1. 15—1207, 1. 1; 3135, 1. 8–20). Furthermore, the state courts' finding that none of the twenty-five (25) members of the second panel who were seated after the publication of the allegedly inflammatory articles had read the articles [*Bell,* 724 S.W.2d at 798], is an additional indicator that Bell's right to a fair trial was not prejudiced by the publicity. *Lowenfield,* 817 F.2d 285 at 296.

Because Petitioner has failed to show that the Trial Court abused its discretion causing prejudice, this point is overruled.

### D. Speedy Trial

In Bell's eighth point it is argued that "Petitioner was denied a speedy trial in light of the eight year gap between the crime (1974) and the instant trial (1984)".

The United States Supreme Court has set forth a test to resolve federal constitutional speedy trial claims which involves balancing: (1) the length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his rights; and (4) resulting prejudice to the defendant occasioned by the delay. *Barker v. Wingo,* 407 U.S. 514, 530, 92 S.Ct. 2182, 2191, 33 L.Ed.2d 101 (1972). Since it is apparent that an eight (8) year delay from the time of indictment to the time of trial is "presumptively prejudicial", this Court turns to an analysis of the three (3) remaining Barker factors.

*Millard v. Lynaugh,* 810 F.2d 1403, 1406 (5th Cir.1987).

As to the reasons for the delay, the record reflects that the vast majority of delays were attributable to Bell. *See: State v. Bell,* Cause No. 31679, Docket Sheet, Appendix A to Respondent's Answer, Motion for Summary Judgment and Brief, filed April 8, 1987. Thus this factor does not weigh in Bell's favor. *McCoy v. Cabana,* 794 F.2d 177, 180 n. 1 (5th Cir. 1986); *Hill v. Wainwright,* 617 F.2d 375, 378 (5th Cir.1980).

Similarly, the third Barker factor does not benefit Bell as he did not assert a speedy trial violation until 1982. Although the docket sheet shows that Bell made three (3) requests for trial settings, Bell subsequently moved for nearly all of the continuances. At no time prior to 1982 did he complain of any alleged hardship resulting from the delay. *Gray v. King,* 724 F.2d 1199, 1203 (5th Cir.), cert. denied, 469 U.S. 980, 105 S.Ct. 381, 83 L.Ed.2d 316 (1984); *United States v. Avalos,* 541 F.2d 1100, 1115 (5th Cir.), cert. denied, 430 U.S. 970, 97 S.Ct. 1656, 52 L.Ed.2d 363 (1977).

As to the final prong of the Barker test—prejudice to the defendant—three (3) interests should be considered: (1) preventing oppressive pretrial incarceration; (2) minimizing a defendant's anxiety and concern; and (3) limiting the possibility that the defense will be impaired. *Barker,* 407 U.S. at 532, 92 S.Ct. at 2192; *Millard,* 810 F.2d at 1406. The first two (2) interests do not demonstrate prejudice in this case in that Bell was already incarcerated, during the period of delay, for the Irene Chisum crime. As to whether or not the delay impaired his defense, Bell alleges two (2) medical witnesses became unavailable who would have testified that he was unable to give a voluntary confession due to mental retardation. However, Bell does not explain why other competent medical witnesses could not have testified on his behalf regarding this permanent physical condition. Furthermore, even if Bell had had experts testify that he was mentally retarded, absent a showing of police coercion, he could not have prevailed on the claim that

his confession was involuntary. *Connelly,* supra; *Reddix,* 805 F.2d at 515–517.

▆▆▆ Since the record reflects that the delays were generally attributable to Bell, that Bell failed to timely assert his speedy trial claim, and that he was not prejudiced by the delay, it cannot be said that Bell's federal constitutional right to a speedy trial was violated. This point is therefore overruled.

### E. Prosecutor Summation

Bell also complains that "[t]he Prosecutor's summation was fatally prejudicial in that it appealed to community sentiment and suggested both that appellate courts would correct any errors and that the defense had attempted to subvert the truth by its evidentiary objections".

▆▆▆ For constitutional error to have occurred, it is not enough that the prosecutor's statement was undesirable, ill-advised, unfortunate or even universally condemned. *Darden v. Wainwright,* 477 U.S. 187, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986); *United States v. Monaghan,* 741 F.2d 1434, 1437, 1443 (D.C.Cir.), cert. denied, 470 U.S. 1085, 105 S.Ct. 1847, 85 L.Ed.2d 146 (1985). Rather, a prosecutor's improper argument will be reversed only when the argument "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden,* 106 S.Ct. at 2472; *Donnelly v. De-Christoforo,* 416 U.S. 637, 643–48, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974); *Dobbs v. Kemp,* 790 F.2d 1499, 1503 (11th Cir.1986). Allegedly improper prosecutorial comments must be considered in context when evaluating their propriety. [*United States v. Saenz,* 747 F.2d 930, 939 (5th Cir.), cert. denied, *Solis v. United States,* 473 U.S. 906, 105 S.Ct. 3531, 87 L.Ed.2d 655 (1985).] And in assessing the effect a prosecutor's remark had on a jury, due respect must be accorded a juror's common sense and discrimination. *Monaghan,* 741 F.2d at 1440–1441.

### 1. Appeal To Community Sentiment

This Court does not agree with Petitioner's contention that the prosecutor's argument impermissibly suggested to the jury that it would have to "face" the community to explain its verdict. Rather, when viewed in context, the argument merely urged the jurors to apply common sense to their deliberations.

▆▆▆ Petitioner contends that the following argument is unconstitutional:

"[THE PROSECUTOR]: ... remove yourself to your home and think about your talking to your friends and your neighbors, people who have not been involved and caught up in this hot atomosphere, but who've (sp.) still maintained and managed to maintain their common sense. Remove yourself to your home and think about talking to them (sp.), and they will ask you, and remember and think about how they will ask you at the end of the case when it's all over.

[DEFENSE]: Objection, Your Honor. It's an attempt to intimidate the jurors, as to what outside pressures or influences they may be subjected for, based upon the deliberations and their verdict in this trial.

[THE COURT]: Overruled.

. . . . .

[THE PROSECUTOR]: And your neighbor and friend would say to you, 'Well, I'm sure that that's pretty strong evidence. What did you do, convict the guy in five minutes?' or, you know, 'What was the punishment in the case?' You see, they still maintain their common sense.

[DEFENSE]: Objection, Your Honor. We renew our objection to that line of argument and comments to the jury. It tends to intimidate the jurors and have them base their verdict on something other than the facts presented in this case.

[THE COURT]: Overruled.

[DEFENSE]: We will also object, Your Honor, on the basis that he's attempting to have the jurors—to convince the jurors that they should choose something other than their free, fair, and full individual judgment as to evidence before them and no other evidence, Your Honor.

He's, obviously, attempting to get them to be influenced by outside community pressures, rather than to go strictly on the evidence that's before them in this trial. We object on that basis.

[THE COURT]: Objection is overruled." (SOF. XVIII 4391, 1. 13—4392, 1. 1; 4393, 1. 13—4394, 1. 11).

Viewing the abovementioned argument in context, however, the Court notes that just prior to making the abovementioned remarks, the Prosecutor stated:

"All we ask, from the D.A.'s point of view,—all we ask is that you evaluate the evidence and use your common sense. The only danger there ever is in a case like this is that one or two jurors might let the defense argument carry them beyond their common sense.

Now, sometimes things get pretty hot and heavy in this courtroom, and things get confused, and we do it everyday. I live in this courtroom, but in a trial things get confused and sometimes you just don't put things in the proper perspective, but there's a way you can avoid getting yourself caught up in that."

(SOF. XVIII 4390, 1. 23—4391, 1. 9).

Clearly, this argument taken as a whole was permissible. The Prosecutor was expressing a legitimate concern that, given the type of case involved, there was a danger that the jurors might decide Bell's guilt or innocence based on emotion, rather than based on a common sense review of the evidence. The references only suggested a manner of mentally separating logic and common sense from the emotion surrounding the trial: by each juror imagining himself discussing the evidence with friends and family members, away from the emotions of the courtroom setting. At no time did the Prosecutor even imply that the community or the jurors' friends and family would expect a guilty verdict. The argument was merely a proper request that the jurors view the evidence logically and use their common sense in reaching a verdict. Bell's claim to the contrary is meritless; this point is therefore overruled. *Cf. Hance v. Zant,* 696 F.2d 940, 950–952 (11th Cir.1983).

2. *Suggestion Of Appellate Review*

■■■ Bell next complains that the following prosecutorial remark was "a thinly-veiled suggestion to the jury that any errors they made at trial would be corrected on appeal".

"[THE PROSECUTOR]: If the defendant is convicted, and if some error is made in the case by some procedure we violated, and an Appeal Court reviews these cases and reviews everything that's on the Record years later. They can reverse the case and send it back and have it retried years later. It happens—

[DEFENSE]: I'm going to object to this Your Honor. It's outside the Record, and there's no testimony of this before the jury.

[THE COURT]: Sustained.

[DEFENSE]: We ask the jury be instructed to disregard

[THE COURT]: So instructed."

(SOF. XVII 4314, 1. 11–24).

This brief reference to appellate review cannot be said to have diminished the jury's sense of responsibility for its sentence sufficient to warrant a reversal. *Moore v. Maggio,* 740 F.2d 308, 320 (5th Cir.), cert. denied, 472 U.S. 1032, 105 S.Ct. 3514, 87 L.Ed.2d 643 (1985). *Cf. Caldwell v. Mississippi,* 472 U.S. 320, 105 S.Ct. 2633, 2639, 86 L.Ed.2d 231 (1985). Furthermore, the Court immediately sustained the defense's objection and instructed the jury to disregard. This point is therefore overruled.

3. *Defense Subversion Of The Truth Through Objections*

Bell contends the following statement constitutes constitutionally impermissible argument:

"[THE PROSECUTOR]: Now, the Defense, on the other hand, as is their right, objected, literally, hundreds of times to virtually everything we tried to introduce and say during the course of the trial. That is, they attempted to keep out from being presented before the jury evidence—

[DEFENSE]: We're going to object to that, Your Honor, as being an improper statement of the law and improper infer-

ence, that we are trying to do something that is inadmissible in the law or improper.

[THE COURT]: Sustained.

[DEFENSE]: We ask the jury be instructed to disregard.

[THE COURT]: So instructed.

[DEFENSE]: We move for a mistrial.

[THE COURT]: That is denied.

[THE PROSECUTOR]: Let's put it this way, you've heard, yourself, during the course of the objections about violations of Constitutional Rights and violations of State Statutes and violation(s) (sp.) of the evidence as prejudicial—

[DEFENSE]: Objection, Your Honor; same objection. He still continues with that line—

[THE COURT]: It's sustained.

[DEFENSE]: We request that the jury be instructed to disregard.

[THE COURT]: The jury is so instructed.

[DEFENSE]: We move for a mistrial.

[THE COURT]: That is denied.

[DEFENSE]: And we further request that the Court instruct Mr. [Prosecutor] not to argue along those lines, as being totally and completely improper, and we request that that be an instruction before this jury.

[THE COURT]: So instructed, Mr. [Prosecutor]. Argue the facts, not the law.

[THE PROSECUTOR]: Your Honor, the basic point that I'm trying to bring out about this is there may be during the course of the trial things that you like to ask, questions you would like us to ask, and there may be testimony that we would like to bring out, but we cannot—

[DEFENSE]: Objection, Your Honor, to that argument being entirely improper. It's trying to portray to the jury that there's something that they could have or should have brought that they didn't bring.

[THE COURT]: Objection is sustained.

[DEFENSE]: We request that you instruct the jury to disregard that.

[THE COURT]: The jury is so instructed.

[DEFENSE]: We move for a mistrial.

[THE COURT]: That is denied, again.

[THE PROSECUTOR]: We follow strict procedures, and that's all I'm trying—the point I'm trying to make to you, that we follow strict procedures and you may want us to ask certain things and we may want to, too—

[DEFENSE]: Objection, Your Honor, he's coming in the back door—this is just

[THE COURT]: Objection is sustained. That's the same basic thing, Mr. [Prosecutor]. Move on to what the law requires or allows you to do.

[DEFENSE]: We ask for another instruction regarding that, Your Honor.

[THE COURT]: The jury is so instructed.

[DEFENSE]: We move for a mistrial.

[THE COURT]: That's denied.

[THE PROSECUTOR]: The only last thing I would like to say about the procedure, and I won't get into the details of it, but you may have realized by now the basic incongruity with our System, because we're dealing here with the deaths of Ferd and Irene Chisum, and there is nobody—there was nobody there to protect their Constitutional Rights, like Walter Bell—

[DEFENSE]: We object to that argument, Your Honor. He's inferring that the Defense is somehow to blame for not—for exercising the rights that he clearly has under the Constitution and under the State, and we would request that the objection be sustained and the prosecutor once again be instructed not to go into matters that he clearly knows is not proper argument before the jury.

[THE COURT]: None of us know what he clearly knows, Mr. [Defense Attorney]. Your objection is overruled. Go ahead.

[THE PROSECUTOR]: That's the whole incongruity of our System. That's what we are dealing with here. Nobody was there to protect their Constitutional Rights. Nobody was there to raise procedure of technicality. They could not— (interrupted).

[DEFENSE]: We're going to object to that, again, along the same lines, as raising procedural technicalities, and it's improper argument at this time and it tends to show the jury that whatever rights the defendant has is somehow to his detriment when the victims did not have it.

[THE COURT]: Overruled.

[THE PROSECUTOR]: Nobody—essentially, they could not appeal their death sentence to a higher court. Now, these are the rules we have to abide by and we're going to do and we have to do it. This is the society and the civilization that we have created in the Twentieth Century. We must, and we will, follow those procedural rules and we still, despite those limitations, see that justice is done in this case.

[DEFENSE]: Objection, Your Honor, that it's an improper argument and it's trying to relate to the jury that there's something they could have done or should have done that they did not do before this jury, and thus were prevented—the jury having a full disclosure of the relevant facts.

[THE COURT]: Overruled."

(SOF. XVIII 4363, 1. 19—4368, 1. 21).

While the Court notes that the Texas Court of Criminal Appeals recognized that this argument was improper [*Bell,* 724 S.W.2d at 803], the statement did not "so infect the trial with unfairness as to make the resulting conviction a denial of due process". *Darden,* 106 S.Ct. at 2472. The record does not show, as Petitioner contends, that the Prosecutor "invited the jury to believe that Petitioner's attorneys were engaged in some improper legal chicanery to prevent a proper trial". At all times the Prosecutor agreed that settled procedural rules must be followed by the State and the Defendant. And at SOF. XVII 4363, 1. 19–22, the Prosecutor stated: "Now, the defense, on the other hand, *as is their right,* objected, literally hundreds of times to virtually everything we tried to introduce and say during the course of the trial".

In addition to examining a prosecutor's statement as a whole, a reviewing court is bound to examine the argument in the context of the entire trial to determine if the statement was so offensive as to offend the defendant's right to a fair trial. *United States v. Lewis,* 759 F.2d 1316, 1350 (8th Cir.), cert. denied, *Milburn v. United States,* 474 U.S. 994, 106 S.Ct. 406, 88 L.Ed.2d 357 (1985); *United States v. Patel,* 762 F.2d 784, 795 (9th Cir.1985). The record as a whole shows that Bell's conviction was based on a very strong state's case. Additionally, the Trial Court promptly instructed the jury to disregard the Prosecutor's argument. *See: United States v. Livingston,* 816 F.2d 184 at 195 (5th Cir.1987). In this context it cannot be said that the Prosecutor's statement deprived Bell of a fair trial.

For the abovementioned reasons, this point is overruled.

### F. Ineffective Assistance of Counsel

Bell's final claim is that he received "ineffective assistance of counsel at the penalty phase of his trial by counsel's failure to present psychiatric evidence as to his mental retardation as a mitigating factor". Although the jury from the 1974 Irene Chisum trial had returned a death sentence despite the use of psychiatric testimony,[2] Bell contends that he should have had a psychiatric reevaluation in 1982, for the reason that his mental state might have improved to such an extent since 1974 that the 1982 jury would not have found him to have been a future danger to society, and thus would not have imposed a death sentence. TEX.CODE CRIM.PROC.ANN., art. 37.071(b)(2) (Vernon Supp.1987). In order to thoroughly review this claim, the Court scheduled an evidentiary hearing for May 11, 1987. At that hearing Bell moved for the appointment of a defense psychiatrist in order "to properly demonstrate 1982 counsel's serious dereliction at the penalty phase of Petitioner's trial". *See:* Application For The Appointment Of A De-

---

**2.** The death sentence was vacated by a federal habeas court in 1984 based on *Estelle v. Smith* error. *Estelle v. Smith,* 451 U.S. 454, 101 S.Ct. 1866, 68 L.Ed.2d 359 (1981).

fense Psychiatrist For Purposes Of 28 U.S.C. § 2254(d) Hearing, p. 2.

▇▇▇▇ In order to demonstrate a Sixth Amendment violation, under the leading case of *Strickland v. Washington* [466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)], it is the Petitioner's burden to show: (1) that counsel's performance fell below an objective standard of reasonable professional service; and (2) that the defense was thereby prejudiced to the extent of there being a reasonable probability that the outcome would have been different, but for counsel's deficient performance. *Brown v. Butler*, 811 F.2d 938, 941–942 (5th Cir.1987); *Thomas v. Lynaugh*, 812 F.2d 225, 229 (5th Cir.1987); *Wilson*, 813 F.2d at 669; *Millard*, 810 F.2d at 1409. Furthermore, in order to sustain the burden of proof imposed by *Strickland*, the Petitioner must overcome the "strong presumption" that the allegedly deficient representation constituted "reasonable professional assistance" or "sound trial strategy". *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2066; *Wilson*, 813 F.2d at 671.

In this very context—claimed ineffectiveness in failing to introduce psychiatric evidence at the penalty phase of trial—the Fifth Circuit Court of Appeals has recently explained the stringent presumption of constitutionally adequate representation thusly:

"Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to secondguess counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable.... A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must over-

come the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' ... There are countless ways to provide effective assistance in any given case. Even the best criminal defense attorneys would not defend a particular client in the same way."

*Lowenfield*, 817 F.2d 285, No. 87–3305, slip op. at 4019, quoting *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065. "This presumption is especially suitable to claims of uncalled witnesses 'because the presentation of witness testimony is essentially strategy and thus within the trial counsel's domain' ". *Millard*, 810 F.2d at 1410, quoting *Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir.1985).

At the evidentiary hearing, Bell's mother, Mrs. Bessie Mae Brown, testified that she was told by school officials when her son was nine (9) years old that he was mentally retarded and had an I.Q. of 54 (FEH. Tr. 19–21; 39); that he had attended special education classes (FEH. Tr. 20–22); that he had to take the United States Marine entrance exam three (3) times before passing (FEH. Tr. 22–25); that he had received a desirable discharge from the United States Marines (FEH. Tr. 25); and that he got along well with his schoolmates (FEH. Tr. 28). Mrs. Brown had testified about these matters at the penalty phase of her son's 1982 trial for the murder of Ferd Chisum.

Trial Counsel Mr. Harold J. Laine, Jr. testified that, in his professional judgment, introducing any psychiatric testimony at the penalty phase would have harmed Bell's case. In formulating his punishment phase strategy, Counsel relied on a review of the testimony and reports of four (4) doctors used at the 1974 Irene Chisum murder trial. The 1974 testimony of the State's experts, Doctors Nottingham and Brown, was that Bell's I.Q. was much higher than Bell's mother opined, being in the range of 70 (FEH. Tr. 45–47 FEH. Exh. 1, 190–191, 213–224; *See also:* FEH. Exh. 1, 236–239; FEH. Exh. 2, 2219, 2224–2225). Dr. C.J. Ruilman testified that Bell's I.Q. level was not in the idiocy range (FEH.

Exh. 2, 2225). It was Trial Counsel's opinion that the medical evidence of record constituted "absolute testimony that he [Bell] was capable of conforming his actions to the law, and that he knew right and wrong, and that he had choices. [FEH. Tr. 48, 1. 25–49, 1. 4; 51, 1. 15–20; FEH. Exh. 1, 231–232, 234, 242–243]. We would have had testimony that he was a borderline—had borderline retardation. We would have had testimony that he had a normal EEG, no brain damage [FEH. Tr. 58, 1. 14–17; FEH. Exh. 1, 213; FEH. Exh. 2, 2225–2226]; we would have had testimony that he'd not used drugs, or anything like that". (FEH. Tr. 45, 1. 19–25). Additionally, there was testimony that Bell's low mental capacity resulted in a diminished capacity to control his impulses and he was thus more prone to be a future danger to society. (FEH. Tr. 48; FEH. Exh. 1, 191–197, 207–208, 211). *See also:* FEH. Exh. 1, Punishment Testimony and FEH. Exh. 2, Testimony of Dr. C.J. Rulman.

Based on the abovementioned testimony, it was Laine's belief that a jury probably would have been persuaded that Bell posed a future danger to society, thus increasing the likelihood of a death sentence. Art. 37.071(b)(2) V.A.C.C.P. (FEH. Tr. 47, 1. 14–18; 48, 1. 7–18; 52, 1. 2–14; 53, 1. 8–19). Similar concerns influenced Laine not to have Bell reevaluated by a psychiatrist in 1982: (1) if the results were unfavorable to Bell his defense would have been severely hampered (FEH. Tr. 59, 1. 17–19) (and this was likely since the same doctors would probably have been appointed on behalf of the State to examine a mental condition which is relatively permanent in nature (FEH. Tr. 44, 1. 13–16; 54, 1. 4–15; 66, 1. 22–67, 1. 14; 70, 1. 23—71, 1. 2)); (2) the unfavorable psychiatric evidence from the 1974 trial could have been brought to the jury's attention in 1982 through rebuttal testimony (FEH. Tr. 45, 1. 2–4; 54, 1. 16–22; 67, 1. 15–24; 70, 1. 5), *Williams,* 809 F.2d at 1068–1069; (3) even the defense psychiatric testimony (Doctors Ruilman and Wharton) from the first trial was less than favorable to Bell (FEH. Tr. 44, 1. 22–24; 46, 1. 5–11; 47, 1. 14–18; 48, 1. 25–49, 1. 4; 52, 1. 19–22); and (4) the use of

the 1974 psychiatric testimony would likely have harmed Bell, as the 1974 jury had returned a death sentence (FEH. Tr. 41, 1. 10–13). Because of these very real concerns, Laine felt it to be in Bell's best interest if evidence tending to "humanize" was presented through the testimony of lay witnesses rather than by medical experts (FEH. Tr. 45, 1. 4–11; 1. 1–4); therefore, Bell asserted his Fifth Amendment privilege when the State moved to have him examined by a psychiatrist in 1982 (FEH. Tr. 53, 1. 22—54 1. 3; SOF. IIA 603–608). *Cf. Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 1089, 1091, 84 L.Ed.2d 53 (1985). Laine stated: "We felt we could better serve our tactics and Walter's interest by showing what we did through people that knew him, and we got about the same information in, I felt". (FEH. Tr. 50, 1. 18–20).

As to Bell's request to have a psychiatrist appointed at this juncture in the proceeding in order to demonstrate his attorney's ineffectiveness, the Court applies the following standard in reviewing trial counsel's performance:

> "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments".

*Lowenfield,* 817 F.2d 285, No. 87–3305, slip op. at 4019–4020, quoting *Strickland,* 466 U.S. at 691, 104 S.Ct. at 2066.

Under the facts of this case as set forth above, applying a "heavy measure of deference to counsel's judgments", Counsel's considered decision not to have Bell reevaluated in 1982 was reasonable. To appoint

a psychiatrist now for comment on trial Counsel's performance would constitute nothing more than Monday morning quarterbacking in the eleventh hour [*Millard*, 810 F.2d at 1409]—a practice this Court is strictly prohibited from indulging in under *Lowenfield*, id.

 In summary, Petitioner has not demonstrated that Counsel's failure to use psychiatric evidence at the penalty phase of the 1982 trial violated any federal constitutional guarantees. Rather, Petitioner's Counsel testified that his decision not to offer psychiatric evidence was a deliberate trial strategy to avoid the possible introduction of the 1974 psychiatric testimony through rebuttal [See *Lowenfield*, 817 F.2d 285 at 291], as well as to avoid the possible proliferation of unfavorable evidence against his client. This testimony demonstrates that defense counsel neither neglected nor ignored the issue of Bell's mental retardation. *Cf. Jones v. Thigpen*, 788 F.2d 1101, 1103 (5th Cir.), cert. denied, —— U.S. ——, 107 S.Ct. 1292, 94 L.Ed.2d 148 (1987). Analyzing these facts under the ambit of the Strickland decision, Counsel's conduct certainly falls within the range of reasonable professional assistance. Additionally, Petitioner has made no showing of prejudice, since under Texas law the brutal circumstances of the offense are a sufficient basis, standing alone, for a jury finding of future dangerousness to support a death sentence under Art. 37.071(b)(2) V.A. C.C.P. *See: Bell*, 724 S.W.2d at 803–804 (citations omitted); *Accord: Willie v. Maggio*, 737 F.2d 1372, 1394 (5th Cir.), cert. denied, 469 U.S. 1002, 105 S.Ct. 415, 83 L.Ed.2d 342 (1984); *Cf. Jones*, 788 F.2d at 1103.

For the aforementioned reasons, this point is overruled.

## IV.

### Conclusion

Because Bell has not made a substantial showing of the denial of a federal right, it is ORDERED that Petition For Writ Of Habeas Corpus is hereby DENIED, and the Application For Appointment Of A Defense Psychiatrist is likewise DENIED. Further, it is ORDERED that the Stay Of Execution imposed by this Court pending review of Petitioner's application is hereby DISSOLVED.